THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILLIAM MAHON, Defendant-Appellant.

First District (1st Division)    No. 77-1852

Opinion filed September 24, 1979.

James J. Doherty, Public Defender, of Chicago (James L. Rhodes, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Paul C. Gridelli, and Wesley H. H. Ching, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, William Mahon, was charged by indictment with the offenses of murder and concealment of a homicidal death. (Ill. Rev. Stat. 1971, ch. 38, pars. 9—1, 9—3.1.) Following a jury trial, he was found guilty of each offense. The court sentenced defendant to concurrent terms of 25-50 years for murder and 3-10 years for concealment of a homicidal death. Defendant appeals. We affirm.

Wade Fournier testified that in October 1973 he was a very good friend of the decedent, Charles Watts, Jr. They both worked at a service station owned by decedent's father. On October 30, 1973, at about 5 p.m., Fournier met Watts at the service station. They spent the evening with Fournier's girlfriend and her friend. Watts left Fournier's apartment at about 11:30 p.m., after making plans to see the girls again. According to Fournier, Watts left in very good spirits. This was the last occasion Fournier saw Watts alive.

The next day (October 31), Fournier was informed that Watts did not report to work. That evening Fournier and a friend went to Watts' apartment. Fournier had learned that Watts' father had gone there earlier that day but had learned nothing. No one was home, but Watts' car was in the parking lot. Fournier testified that Watts would never go anywhere without his car.

On November 2, Fournier and several friends returned to Watts' apartment. They questioned defendant, Watts' roommate and close friend, about Watts' disappearance. Fournier testified that defendant twice replied, "I didn't kill him." According to Fournier, defendant was in tears at the time. While the others questioned defendant, Fournier inspected the apartment. He noticed that Watts' bedroom furnishings were gone, Watts' clothing was no longer in the closet, and a wall had been painted black. However, Watts' toiletries were still in the bathroom and his keys were in the kitchen. Fournier asked defendant if he knew anything about Watts that he wouldn't tell Watts' parents, but received no reply.

On cross-examination, Fournier described a final encounter with defendant which occurred several days later. He and Watts' brother, Steve, confronted defendant in a parking lot. Steve grabbed defendant and angrily questioned him concerning his brother's whereabouts. According to Fournier, defendant ran away.

Charles Watts, decedent's father, testified that during the fall of 1973 defendant was his son's closest friend and roommate. His son worked at his service station as a mechanic and on October 30, 1973, put in a normal day's work. The morning of October 31, Watts noticed that his son was not at work. An employee had tried to telephone him, but didn't receive an answer. At about 10 a.m., Watts went to his son's apartment, but found no one there. As he was leaving, he saw defendant drive into the lot. Defendant said he hadn't seen his roommate recently. Watts twice asked defendant to let him into the apartment. Defendant replied that he had to drive to Antioch and didn't have time. Only after Watts insisted did defendant comply. His son was not in the apartment. On November 2, at about 6 p.m., Watts returned to his son's apartment. Defendant again insisted that he didn't know Chuck Watts' whereabouts, but said he wanted to talk to Mrs. Watts. Defendant, along with his girlfriend Carol, came to the Watts' residence a few minutes later. He tried to convince the Watts that it was normal for someone of Chuck's age to disappear without telling his parents where he went.

Dorothy Watts, decedent's mother, testified that she learned about her son's absence from her husband. On November 1, 1973, she called the Cook County sheriff's office and reported him missing. Mrs. Watts

testified that during their conversation on November 2 defendant said there were no problems between him and her son. He suggested Chuck may have gone away with someone in another car because his clothes were gone. She also telephoned defendant on November 8 and asked him to place a message to Chuck on his bedroom door. Defendant replied, "What makes you think he is coming back?"

William Siers testified that on November 3, 1973, he and a friend were training dogs in a wooded area west of Elgin, in Kane County. At about 7:30 p.m., they noticed an army blanket covering something. Siers looked under a corner of the blanket and saw part of a man's head. Certain that the man was dead, Siers went to a nearby farmhouse and called the county sheriff. When the police arrived, Siers observed them uncover a nude body which was wrapped in a sleeping bag, blanket and sheet.

Officer Stephen Charles Nelson, of the Kane County Sheriff's Office, testified that he was one of the officers who viewed the body that night. Some wire and twine were also recovered at the scene. The body was subsequently transported to Elgin State Hospital.

Officer Lawrence Troka, of the Cook County Sheriff's Police, testified that on November 2, 1973, he was assigned the Charles Watts missing person case. As part of his investigation, Troka telephoned defendant several times. Defendant told Troka that he didn't know where Watts was or who his close friends were. Defendant also said he had taken care of a loan from Watts. On November 14, Troka received a photograph of Chuck Watts from Mrs. Watts. The next day he noticed a resemblance between Watts' picture and a photograph and description of the body recovered by the Kane County Sheriff's Office. A dental comparison confirmed that the body recovered was that of Chuck Watts. Mr. Watts, recalled as a witness, testified that he identified his son's body at Elgin State Hospital.

Officer Daniel Genty, an evidence technician for the Cook County Sheriff's Office, testified that he was assigned to investigate Chuck Watts' death. He observed, photographed and took fingerprints from decedent's body and processed the physical items found at the scene. After a search warrant was obtained, Genty and two other investigators examined defendant's car. Clothing was found in the rear seat and a dry, reddish substance was observed in various parts of the trunk. The mat for the trunk was missing. A subsequent visit to decedent's apartment also revealed dry, red spots on the bedroom wall and on the kitchen floor.

The parties stipulated that the red spots found in defendant's car trunk and apartment were Group "A" human blood and that decedent had type "A" blood. It was also stipulated that Dr. William Stweart, a criminalist for the Illinois Department of Law Enforcement, compared

the speaker wire recovered from the scene of the body with wire found in the kitchen of defendant's apartment. In Stweart's opinion these pieces of wire could have the same origin.

Investigator Phillip Bettiker, of the Cook County sheriff's police, testified that he was assigned to investigate the disappearance of Charles Watts. On November 3, 1973, Bettiker contacted defendant's employer, who indicated that defendant had not been to work for several days. Bettiker also had occasion to view decedent's bedroom and observed no furniture, except for a chair. Various cleaning items were also in the bedroom. He noticed that the wall had been freshly painted and that a parachute hanging from the ceiling had a spot of blood on it.

At about 1:30 a.m. on November 16, 1973, Bettiker observed defendant and his girlfriend driving into Illinois from Wisconsin. Defendant was apprehended and taken to a police station. There he was advised of his *Miranda* rights and informed that a search warrant for his car would be obtained. Bettiker was present during the search of defendant's car and observed red smears on the inside of the trunk roof. Defendant was released and disappeared. In late February of 1974, defendant's car was found abandoned in a Waukegan hospital parking lot. On October 9, 1974, Bettiker apprehended defendant while he was hiding behind a gas station near an abandoned car. Defendant's girlfriend had called Bettiker and informed him she was meeting defendant at a service station near Antioch, Illinois. According to Bettiker, the police made extensive efforts to locate defendant between November 17, 1973, and October 9, 1974.

On October 11, 1974, defendant gave a statement concerning the incident. His attorney, an assistant State's attorney and Investigator Bettiker were present. In his statement, defendant stated that on the night of the incident he came home at about 1:30 a.m. and saw Chuck lying on the waterbed in his bedroom. Defendant entered the bedroom to clean up the closet, when Chuck voiced concern over the many people that had been staying at the apartment. Defendant's girlfriend had just moved out and Chuck wanted her possessions removed. Defendant continued to clean up the closet and ignored Watts. Watts began shoving defendant and shouting at him. According to defendant, Chuck was drunk. Defendant did not resist him, but walked away. He returned to cleaning the closet, but glanced up and saw Watts swing a three-foot piece of iron at him. Defendant stated that he either avoided the blow or was hit in the arm. Both men ended up on the floor and defendant gained possession of the bar.

Defendant stated that he was still on the floor when Watts attacked him again. According to defendant, he swung the bar, intending to hit Watts in the side, but struck him in the head. Defendant did not

remember if Watts had anything in his hands when he attacked the second time, nor does he remember how many times he struck Watts. He recalled seeing Watts bleed and breathe his "last breath" shortly after being struck. Defendant claimed great difficulty remembering the events thereafter. He said that he was confused, dizzy and mentally depressed about Watts' death.

Defendant did remember removing the body, placing it in his car trunk and driving west most of the night. Along the way, he threw the bar into a river. He left Watts' nude body in a secluded area. Defendant confirmed seeing Watts' father in the parking lot on October 31. He allowed Mr. Watts to enter the apartment. Although there was blood on the waterbed and in the bathroom, Mr. Watts made no comment. Defendant subsequently cleaned the apartment, got rid of the waterbeds, but left blood on the parachute.

Defendant recalled making two trips to see his parents in Wisconsin. He left his car in a hospital parking lot and went hitchhiking. He hitchhiked to different parts of the country for nine or 10 months and used various assumed names. Before he started hitchhiking, defendant threw out his wallet and camping gear, including warm camping outfits and gloves. He stated that during this time he wasn't ready to report Watts' death to the police. Defendant returned to Illinois intending to inform the authorities about Watts' death and his involvement. He returned because he had recovered from a nervous breakdown, felt strong-willed, reliable and responsible. He maintained that Watts' cause of death was the blow he delivered with the iron bar. He was aware that the pathologist had noted a bullet wound as the cause of death, but denied shooting Watts.

Dr. William Gibbons, a pathologist, testified that he performed an autopsy on decedent on November 5, 1973. An external examination of the body revealed a 4½-inch-long laceration of the scalp, a two-inch deep hole in front of the ear and bruises and abrasions on the neck, left eye, lips, right shoulder and right hand. An internal examination revealed extensive shattering of the skull, a broken jaw and bone and brain tissue missing under the skull laceration. Dr. Gibbons further testified that he found stomach contents in the respiratory tract and mouth and sperm present in the rectum. On cross-examination, Dr. Gibbons conceded that the rectal examination method he used could have caused the victim's sperm to contaminate the rectal smear.

Dr. Gibbons testified that in his opinion the cause of death was the extensive destruction of the brain and skull and associated hemorrhaging. He believed the injuries represented at least four or five blows. The fatal head injury was caused by the use of extreme force. He concluded that decedent lived for a very brief duration after the injury to the head.

Margaret Mahon and Joseph Mahon, defendant's parents, testified in

his behalf. They stated that during November 1973 defendant and his girlfriend visited their home in Wisconsin on two occasions. Mrs. Mahon said that her son appeared thin and tired, but otherwise seemed all right. Mr. Mahon testified that his son did not look well, appeared rundown, nervous, upset and was not his normal self. When Mr. Mahon inquired about defendant's condition, defendant said he was a little bit worried. When defendant and his girlfriend left after the second visit, the Mahons noticed the local police followed. The next day they saw defendant at the Niles police station. He came home with them for a day. After that his parents did not see him or receive any messages for 11 months. Mrs. Mahon stated that her son was never a behavior problem. Both parents stated that it was unusual for their son to fail to tell them where he was going. When they saw him again, he had gained weight and his physical appearance had improved.

Dr. William Fisher, a clinical psychologist, testified that he examined defendant on February 13 and 23 of 1976. Dr. Fisher administered numerous psychological tests to defendant. Based on the various tests, Dr. Fisher believed defendant was psychotic, in that he had limited contact with reality. Dr. Fisher was of the opinion that defendant would have tested the same on October 30, 1973.

Dr. Albert Stipes, a psychiatrist, testified that he examined defendant on two occasions. Based on these examinations and the results of the psychological tests administered by Dr. Fisher, Dr. Stipes diagnosed defendant as schizophrenic—latent type. He was of the opinion that defendant suffered from this mental illness on October 30, 1973. People suffering from schizophrenia—latent type can become psychotic under severe stress or while under the influence of certain drugs. Based on defendant's statement to the police on October 11, 1974, Dr. Stipes believed that defendant was grossly psychotic on the date of the incident. He believed defendant could not conform his behavior to the requirements of the law. It was also Dr. Stipes' opinion that defendant suffered from a psychotic episode after the incident and recovered while out of the State.

On cross-examination, Dr. Stipes testified that his conclusions were based exclusively on information from defendant and upon defendant's behavior. He acknowledged that defendant's answers were evasive and that in his opinion defendant lied at times. This was also evident in defendant's statement to the police. He stated that schizophrenia—latent type individuals are not psychotic all the time and there is no accurate way of determining the existence of past psychotic episodes.

In rebuttal for the State, Investigator Phillip Bettiker, Wade Fournier, and Mr. and Mrs. Charles Watts all testified that in their opinion defendant appeared sane. Sergeant Walter Treiber, of the Kane County

Sheriff's Police, testified that he was the first officer to view decedent's body. Decedent's right hand was tightly grasping the blanket and there was a wound on the back of the hand.

Dr. Frank Lorimer, a psychiatrist for the Psychiatric Institute of the Circuit Court of Cook County, also testified for the State. He conducted an examination of defendant pursuant to the trial court's order. Dr. Lorimer's evaluation was based upon his examination of defendant, the results of psychological tests administered by Dr. Garvin and police reports. In Dr. Lorimer's opinion, defendant was sane at the time of his examination. Moreover, there was no evidence indicating he was other than sane at the time of the offense. There was no deficiency in defendant's contact with reality; hence, he was not psychotic. Dr. Lorimer diagnosed defendant as suffering from an antisocial personality disorder.

On cross-examination, Dr. Lorimer read defendant's statement to the police of October 11, 1974, and testified that it did not indicate that defendant was psychotic at that time. He interpreted defendant's throwing away his belongings as an attempt to hide his identity.

In surrebuttal, Dr. Robert DeVito, a psychiatrist and superintendent at Madden Mental Health Center, explained that individuals suffering from schizophrenia—latent type experience brief psychotic episodes in which they lose contact with reality, yet may appear sane. Dr. Stipes was recalled and testified that such persons may appear sane, although they may not remember events during the psychotic episode.

Defendant contends that he was not proved guilty of murder beyond a reasonable doubt. Specifically, he argues: (1) that the State failed to prove he was not acting in self-defense and used reasonable force; or (2) that there is evidence of sufficient provocation to require imposition of the lesser included offense of voluntary manslaughter.

■ We are of the opinion that the record (as summarized above) demonstrates overwhelming evidence of defendant's guilt of murder. Defendant's inculpatory statement to the police is corroborated by ample circumstantial evidence of guilt and evidence of his flight.

Turning to defendant's specific objections, self-defense is not supported by the evidence adduced at trial. According to defendant's statement on the night of the incident, Watts voiced concern over the many people who had been staying at the apartment. Watts began shoving defendant around with his bare hands and shouted at him. Defendant claimed he did not resist but walked away, thinking Watts was drunk. Defendant glanced up and saw Watts swing a three-foot piece of iron at him. Defendant avoided the blow and both men ended up on the floor. Watts came at defendant again and defendant struck him in the head with the iron bar. Defendant claimed he meant to hit Watts in the side. He could not remember if Watts had anything in his hands during his

second attack, nor could he remember how many times he struck Watts.

There was considerable medical evidence concerning the nature and extent of decedent's injuries. Dr. Gibbons' examination revealed a 4½ inch laceration of the scalp, a two-inch deep hole in front of the ear and bruises and abrasions on the neck, left eye, lips, right shoulder and right hand. Moreover, decedent's skull was shattered, jaw bone broken, brain tissue was missing, stomach contents were found in his respiratory tract and mouth, and sperm was present in his rectum. Dr. Gibbons believed that these injuries were occasioned by four to five blows of extreme force.

The nature and extent of decedent's injuries certainly militates against defendant's theory of self-defense. Moreover, even if the jury accepted defendant's statement, it is apparent that he delivered a tremendous blow to decedent's head after he disarmed Watts. Defendant's statement contains no reference to his belief that his actions were necessary to prevent his imminent death or great bodily harm. Nor can we imply a reasonable belief that such circumstances existed at the time as are required to justify the use of deadly force under section 7—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1971, ch. 38, par. 7—1). It is apparent that under the circumstances of this case the blow or blows administered by defendant constituted unreasonable force. Even if defendant believed he was in danger of great bodily harm, the jury properly found that belief was also unreasonable. (See *People v. Shipp* (1977), 52 Ill. App. 3d 470, 367 N.E.2d 966.) Moreover, even assuming the statement raises a valid claim of self-defense, it is not incumbent on the trier of fact to accept defendant's version of the incident. See *People v. Russell* (1975), 29 Ill. App. 3d 59, 329 N.E.2d 450.

*People v. Benedik* (1974), 56 Ill. 2d 306, 307 N.E.2d 382, concerns comparable circumstances. Defendant claimed that the victim attacked him with an object in his hand but was stabbed in the ensuing struggle. Defendant also said he found the other victim dead after the fight. Both victims died of knife wounds. Defendant subsequently disposed of both bodies. The court noted (56 Ill. 2d 306, 309):

> "* * * The fact that the defendant claims to have acted in self-defense and testified as to his version of the occurrence, however, is not sufficient to elevate his claim to the level of reasonable doubt when his testimony is viewed in the light of all of the other facts and circumstances of the case. The circumstantial evidence against the defendant was substantial. If the jury disbelieved his testimony, as they were entitled to do, they could reasonably have reached the conclusion that the physical evidence, the nature of the wounds on Kresmery's body, the defendant's attempt to hide the bodies and destroy other evidence, his flight and his apparent motive established his guilt beyond a reasonable doubt. It is not

necessary that the jury disregard the inferences which naturally flow from this evidence, nor is the trier of fact 'required to search out a series of potential explanations compatible with innocence, and elevate them to the status of a reasonable doubt.' *People v. Russell,* 17 Ill. 2d 328, 331."

Defendant also contends there was sufficient provocation to support reduction of the offense to voluntary manslaughter. We note that defendant failed to tender an instruction on "provocation" voluntary manslaughter. (Ill. Rev. Stat. 1971, ch. 38, par. 9—2(a).) Defendant has the responsibility of tendering instructions as to his theory of defense. (*People v. Davis* (1966), 74 Ill. App. 2d 450, 221 N.E.2d 63.) In a murder prosecution, failure to request an instruction on voluntary manslaughter constitutes a waiver of that defense. *People v. Martin* (1977), 46 Ill. App. 3d 943, 361 N.E.2d 595.

■■ In any event, the nature and extent of decedent's injuries (including evidence that his right hand was grasping the blanket and of the "defensive" wound on the back of that hand) could be relied upon by the trier of fact to negate defendant's account of the incident. The jury was in a superior position to decide what, if any, weight to attribute to defendant's account to the police.

The State's proof that the killing by defendant constituted murder and that he was also guilty of concealing a homicide was based in part on circumstantial evidence. The supreme court's statement in *People v. Fletcher* (1978), 72 Ill. 2d 66, 71, 377 N.E.2d 809, is particularly pertinent:
  "This court recently discussed the use of circumstantial evidence in criminal cases in *People v. Williams* (1977), 66 Ill. 2d 478, 484-85:
    'We find apposite here the statement in *People v. Marino,* 44 Ill. 2d 562, 580, that "it is well settled that the commission of an offense may be established entirely by circumstantial evidence. As we observed in *People v. Bernette,* 30 Ill. 2d 359, 367, 'a conviction may be sustained upon circumstantial evidence as well as direct evidence, (*People v. Russell,* 17 Ill. 2d 328,) it being necessary only that the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime. (*People v. Magnafichi,* 9 Ill. 2d 169; *People v. Grizzel,* 382 Ill. 11.) The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt.' " Proof of guilt beyond a reasonable doubt

does not require proof beyond any possibility of a doubt. (*People v. Hanson*, 59 Ill. 266; *People v. Branion*, 47 Ill. 2d 70.)' "

(See also *People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.) In our judgment, the evidence here, when viewed as a whole, was sufficient to prove defendant's guilt of both offenses beyond a reasonable doubt.

■■ ■ Defendant next contends that he was not proved guilty of concealment of a homicide beyond a reasonable doubt. Two elements comprise this crime: (1) knowledge that a homicidal death had occurred; and (2) some affirmative act of concealment by the defendant. (*People v. Stiles* (1977), 46 Ill. App. 3d 359, 360 N.E.2d 1217.) Defendant first maintains that no homicide was committed because decedent's death resulted from an act of self-defense. Second, he asserts that the following jury instruction was improper and misstated the law:

"Homicide is a comprehensive word which means any killing of a human being.

It does not necessarily import a crime, but includes also those cases in which the law justifies or excuses the taking of human life."

Our resolution of the reasonable doubt issue is dispositive of defendant's first contention. The weight to be given evidence and determination of credibility are matters for the jury. (*People v. Baker* (1959), 16 Ill. 2d 364, 158 N.E.2d 1.) The jury could, and apparently did, disbelieve defendant's statement that his actions were in self-defense. Furthermore, the instruction given was a proper statement of the law. It is consistent with the definition of homicide found in Black's Law Dictionary 867 (4th ed. 1951) and in Webster's Third International Dictionary 1083 (1961). A similar instruction was approved as harmonious with the plain meaning of the statute in *People v. Coslet* (1976), 39 Ill. App. 3d 302, 349 N.E.2d 496, *aff'd in part & rev'd in part on other grounds* (1977), 67 Ill. 2d 127, 364 N.E.2d 67. Accordingly, since there is ample evidence the defendant committed the murder, hid the body and misled decedent's family and friends in their efforts to locate him, the conviction of concealment of a homicidal death must be upheld.

Defendant's next contention is that the State failed to prove him sane at the time of the offense beyond a reasonable doubt. The State concedes that the issue of defendant's sanity was properly raised at trial. However, the State maintains that sufficient evidence was adduced to sustain its burden of proving defendant was sane at the time of the offense beyond a reasonable doubt. (See *People v. Lono* (1973), 11 Ill. App. 3d 443, 297 N.E.2d 349.) We agree.

■■ There was a direct conflict in expert testimony as to defendant's

diagnosis, whether he was psychotic, and whether he was sane at the time of the offense. It is customarily the function of the trier of fact to resolve conflicts in the evidence and a court of review will not substitute its judgment for that of the trier of fact. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) This principle also applies to the fact issue of defendant's sanity at the time of the offense. See *People v. Ford* (1968), 39 Ill. 2d 318, 235 N.E.2d 576, and *People v. Myers* (1966), 35 Ill. 2d 311, 220 N.E.2d 297, *cert. denied* (1967), 385 U.S. 1019, 17 L. Ed. 2d 557, 87 S. Ct. 752, where juries were justified in finding defendants sane despite a dispute among the experts.

■ Accordingly, the jury could and apparently did accord more weight to the testimony of the State's expert witness, Dr. Lorimer, than defendant's expert, Dr. Stipes. Dr. Lorimer's opinion that defendant was sane was corroborated by four lay witnesses: Investigator Bettiker, Mr. and Mrs. Watts, and Wade Fournier. Lay witnesses may give an opinion on sanity if based upon personal observations. (*People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324.) Moreover, the testimony of defendant's parents did not concern the ultimate issue of their son's sanity, but focused upon his physical appearance. In essence, the defense rests on the diagnosis and opinion of Dr. Stipes. We cannot say the jury's decision to discount his testimony is manifestly against the weight of the evidence. (*People v. Ford* (1968), 39 Ill. 2d 318, 235 N.E.2d 576.) Accordingly, we find defendant was found guilty of each offense beyond a reasonable doubt.

Defendant next argues he did not receive a fair trial because of certain prejudicial error caused by the prosecution. He alleges prejudice because: (1) the deceased's father was called to the stand on three different occasions and the deceased's mother was called to the stand on two occasions; (2) the prosecution commented upon defendant's failure to .consent to a warrantless police search of his car; (3) the prosecutor failed to prove facts stated in his opening statement; and (4) the State made reference to defendant's failure to make a statement until he conferred with counsel.

■ Defendant failed to make timely and proper objections to preserve these issues upon appeal. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817.) Moreover, he failed to raise these issues in his written motion for a new trial and has waived these contentions as grounds for reversal. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) In any event, we find these arguments are without merit.

Defendant argues that the prosecutor intended to inflame the passions and sympathy of the jury by repeatedly calling decedent's

parents to the stand. He also contends that Mrs. Watts was called to testify only to create prejudice because her initial testimony echoed her husband's. As demonstrated by the facts above, Mrs. Watts' testimony was no mere duplication of her husband's initial testimony. She established that she reported her son's disappearance to the police and testified about defendant's attempt to convince them that it was natural for young people like their son to go away without telling their parents.

■■■ We also believe the State properly recalled Mr. and Mrs. Watts. Both initially testified establishing circumstantial evidence of defendant's crimes. Mr. Watts was recalled following another witness' testimony concerning the discovery and identity of his son's body. He then testified about seeing his son's body at the hospital. We find no fault with the State's actions, as Mr. Watts was recalled not to duplicate prior testimony but to assist the jury's understanding of the case by presenting a chronological sequence of events. The State also recalled Mr. and Mrs. Watts as rebuttal witnesses on the issue of defendant's sanity. Since the affirmative defense of insanity was neither indicated nor developed at the time the State presented its case in chief (defendant's counsel reserved his opening argument until the State rested), Mr. and Mrs. Watts were properly recalled to give lay opinions as to defendant's sanity. The matter of recalling witnesses lies within the sound discretion of the trial court (*People v. Schulz* (1971), 1 Ill. App. 3d 212, 273 N.E.2d 736), and the court may properly permit recalling a witness to allow examination as to new matter. (*People v. Thompson* (1978), 57 Ill. App. 3d 134, 372 N.E.2d 1052.) We find no abuse of discretion present.

Defendant next contends that the following direct examination of Investigator Bettiker by the State constitutes prejudicial comment on defendant's failure to allow the police to search his car without a warrant:

"Q: Did you have occasion to say anything to Mr. Mahon regarding his automobile?

A: Well, enroute to or prior?

Q: At your area station.

A: At the area station I advised him that I, I asked him if we—

Q: —Excuse me sir, did you have occasion to advise him of anything?

A: Yes, I advised him of his constitutional rights. * * *

Q: Did you have occasion to say anything to Mr. Mahon, Investigator Bettiker, asking you not what he said to you, but what you said to Mr. Mahon regarding his automobile.

A: I advised him we were, I asked him—

Q: —Excuse me Investigator Bettiker, did you have occasion to inform Mr. Mahon what, if anything you were going to do with regard to his automobile?

A: Informed him we were going to get a search warrant and search his vehicle.

Q: Thank you. * * *"

This excerpt from the record clearly indicates that defendant's contention is frivolous. The first two times Bettiker was asked if he said anything to defendant about his automobile, the prosecutor interrupted his responses to assure that Bettiker did not indicate that the police sought defendant's permission to search his car. Finally, on the third try, the prosecutor obtained the desired answer and avoided the issue of whether the police sought defendant's consent to search his car.

The defendant's next argument is that the following comment made during the State's opening argument was prejudical:

"On November 17 the Cook County Sheriff's obtained and got a search warrant for the search of the defendant's vehicle. They went out, they went back out there to the State highway garage and they forced open the trunk of the vehicle and in the trunk of that vehicle they found pools of human blood."

The State concedes that no evidence was presented that pools of blood were found, but maintains that the error is harmless. We agree.

██ Both the court and the prosecutor gave the jury cautionary directives that opening remarks were not evidence and the court also gave a jury instruction on this point. (See *People v. Vasquez* (1969), 118 Ill. App. 2d 66, 254 N.E.2d 617.) Moreover, although no evidence of "pools" of blood inside defendant's trunk was adduced, the court exhibits and testimony of Officers Genty and Bettiker indicate dried spots of blood therein. No substantial prejudice to defendant was occasioned by this slight discrepancy and the error is clearly harmless (*People v. Vasquez*), especially in light of the overwhelming evidence of defendant's guilt.

Defendant's next argument is that the prosecutor improperly referred to his post-arrest silence in violation of his due process rights. The defendant bases his argument on the following redirect-examination of Investigator Bettiker by the prosecutor:

"Q: Did the defendant talk to you or any police officer on October 9th, 1974, regarding the death of Charles Watts?

A: No.

Q: Did the defendant talk to you or any police officer on October 10th regarding the death of Charles Watts?

A: Not any police officer, no.

Q: Well, who did he speak to, if you know?

A: He consulted Attorney Donald Frey on the 10th.

Q: So is that correct that the first time you heard anything from the defendant's mouth regarding the death of Charles Watts was on October 11th, is that correct?

A: That is correct, he was with him the evening of the 10th and the 11th."

Under the rule of *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, it is a denial of due process for a prosecutor to use defendant's post-arrest silence to impeach an exculpatory story first presented at trial where such silence might be exercised in reliance on *Miranda* warnings. Here, however, the State's reference to defendant's post-arrest silence was invited by defense counsel's earlier cross-examination of Bettiker. Defense counsel introduced into evidence the same information now complained of:

"MR. FREY [defense counsel]: Following your arresting of him [defendant] in Antioch. Did you ask Bill Mahon what his recollection was of what had happened on the early morning hours of October 31st, 1973?

\* \* \*

A: Yes.

Q: In that interviewing that you had at that time, did he give an answer to all of the questions asked?

\* \* \*

A: No he did not.

Q: What question did you ask him that he didn't give an answer to?

\* \* \*

A: A variety of questions. When we asked him what happened, he wouldn't answer. He went, he wouldn't tell us. He wouldn't answer numerous questions.

\* \* \*

A: What happened to Chuck Watts would have been one of the questions that I asked him that I did not get an answer to."

It is apparent that defendant's counsel opened the door to this line of inquiry and the State's questions on redirect were proper. If a defendant procures, invites, or acquiesces in the admission of evidence, even though improper, he cannot complain. *People v. Burage* (1961), 23 Ill. 2d 280, 178 N.E.2d 389, *cert. denied* (1962), 369 U.S. 808, 7 L. Ed. 2d 555, 82 S. Ct. 651.

Additionally, defendant asserts that the prosecutor created an impermissible inference that defendant and his counsel conspired to fabricate an exculpatory story. He cites *People v. Martin* (1975), 29 Ill. App. 3d 825, 331 N.E.2d 311, as authority and complains of the following questioning:

"Q. Well, who did he speak to, if you know?

A. He consulted Attorney Donald Frey on the 10th.

Q. So is that correct that the first time you heard anything from

the defendant's mouth regarding the death of Charles Watts was on October 11th, is that correct?

A. That is correct, he was with him the evening of the 10th and the 11th."

*People v. Martin* is not on point. There, the prosecutor stated during summation that defense counsel would use any means to free his client. This constituted a clear inference that defense counsel was engaged in improper conduct and would suborn perjured testimony from his own witness.

■■ In the instant case, defense counsel had again "opened the door" by eliciting similar testimony that defendant did not give a statement until his attorney was present. (*People v. Burage.*) Furthermore, the mere fact that defendant consulted his attorney before giving a statement in no way implies a "conspiracy to lie" as suggested by defendant.

The defendant also contends that he was incompetently represented by counsel. Our supreme court has consistently applied a strict test in determining whether privately retained counsel is incompetent:

" '* * * [T]he court will not reverse a conviction because of the incompetency of counsel unless the representation is of such a low caliber as to amount to no representation at all or reduces the court proceedings to a farce or sham.' *People v. Torres* (1973), 54 Ill. 2d 384, 391. [Citations.]" (*People v. Murphy* (1978), 72 Ill. 2d 421, 436, 381 N.E.2d 677.)

Competency of counsel depends on the facts and circumstances of each case viewed in their totality from the entire record, rather than a focus upon isolated instances occurring during the course of a trial. *People v. Clark* (1977), 47 Ill. App. 3d 624, 630, 365 N.E.2d 20.

■■ Defendant contests various isolated acts or omissions by his counsel. Our view of the record in its entirety convinces us that defendant was adequately represented by counsel. A defendant is entitled to competent, not perfect or successful, representation. (*People v. Murphy.*) Defense counsel presented two theories of innocence to the trier of fact that were not entirely implausible: self-defense and insanity. He adduced evidence in support of each theory. Successful representation was not arrived at because the jury apparently believed that the State's evidence overcame these defense theories. We find the trial proceedings were not reduced to a farce or sham and that defendant received able and competent representation.

Defendant next argues that having the jury view an X ray of decedent's skull during closing arguments and instructions to the jury denied him a fair trial. Before closing arguments, the prosecutor asked the court's permission to use an X ray of the victim's skull to illustrate the injuries received. Permission was granted over defense counsel's

objection. Defendant contends that the prosecutor went beyond his own representation of what he wanted to use the X ray for. We concur. Pertinent parts of the objectionable closing argument follow:

"Ladies and Gentlemen, who took the first swing? I call as my next witness, Charles Watts, Jr. to the witness stand. Chuck, who took the first swing that night? Chuck, what really happened between you and Mr. Mahon? He can't answer that question. He's not here. He's not here because that man killed him. Killed the only witness who can really contradict his statement that he took the first swing. He killed him. He's not here.

\* \* \*

In the statement, William Mahon says that Chuck took the first swing. Chuck, did you do that? He can't say. He can't testify any more. All we've got is this statement.

\* \* \*

\* \* \* Chuck Watts can't be here today. He says nothing from that witness stand, but he is in this courtroom. He is in this courtroom.

How is he in here? Chuck Watts, what happened to your head, Chuck. I see a big hole there, Chuck, what happened? He doesn't answer, but that x-ray answers and the pathologist answered for him. He came to court and he told you what was on that head and on that neck and on that jaw and below the skin and so forth.

Chuck, I see you have a big hole in the side of your head. I see your skull was crushed. What happened? How did you get the hole in the head, Chuck? How was your skull crushed. You've got a big gaping wound on the back of your righthand side of your head. How did you get that?

\* \* \*

I notice that your neck has got a big round wound on it, too, Chuck, how did that happen? He can't talk, but these pictures talk, these pictures show us.

Chuck, he's here through those pictures. Those pictures will tell you, those pictures will contradict every bit of this statement about self defense when he's on the ground swinging this piece of metal.

Chuck, you've got a big hole in your ear, two inches deep. You must have been punctured by something, Chuck, what happened? Those pictures will tell us because Chuck can't. Those pictures will tell us somebody put something in that kid's head. Somebody put something in that kid's head and somebody might have shot him with a gun.

\* \* \*

It screams from the record, Chuck, how come you got wounds

on your back, Chuck? Why are there wounds on your back? You're supposed to be standing up. He is supposed to be on the ground. How did you get the wounds on the back and on the face and on the hands? Those pictures will tell it for you Ladies and Gentlemen. Those pictures will testify for Charles Watts Jr. and they will contradict any possible theory of self defense.

\* \* \*

MR. FREY: —Your Honor, I'm going to object to this presentation. It is misleading the jury. There is no evidence when he said that.

\* \* \*

THE COURT: I would suggest that the State may continue with their line over objection. *I would however ask you not refer further to the witness Mr. Watts.*" (Emphasis added.)

■■ We find that the conduct of the prosecutor by questioning the X ray of decedent's skull as if it were a witness constantly and improperly exceeded the limits of a fair comment upon the evidence. Clearly his actions were meant to arouse the sympathies and passion of the jury, in violation of well-established principles of trial decorum. (*People v. Jackson* (1974), 23 Ill. App. 3d 945, 320 N.E.2d 591.) His conduct reached the very brink of requiring disciplinary action. See *People v. Butler* (1974), 58 Ill. 2d 45, 317 N.E.2d 35, with reference to improper questioning of witnesses.

Although we are cognizant of the growing concern about improper prosecutorial arguments (see, *e.g., United States v. Spain* (7th Cir. 1976), 536 F.2d 170, 174-76, *cert. denied* (1976), 429 U.S. 833, 50 L. Ed. 2d 97, 97 S. Ct. 96), we believe that in view of the overwhelming evidence against defendant these remarks, although improper, constituted harmless error beyond a reasonable doubt. (See *People v. Baptist* (1979), 76 Ill. 2d 19, 382 N.E.2d 1200; *People v. Radford* (1978), 65 Ill. App. 3d 107, 382 N.E.2d 486.) In addition, the court instructed the jury to consider only the evidence presented and that closing arguments are not evidence. (Illinois Pattern Jury Instructions, Criminal Nos. 1.01 and 1.03 (2d ed. 1968).) Such instructions have been held to cure any possible prejudice from a prosecutor's improper remarks in closing argument. *People v. Brown* (1974), 18 Ill. App. 3d 1049, 310 N.E.2d 498.

■■ Defendant's final contention is that his sentence of 25-50 years imprisonment for murder was excessive. "[T]he imposition of a sentence is a matter of judicial discretion and \* \* \* absent an abuse of this discretion, the sentence of the trial court may not be altered upon review." (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.) In sentencing defendant, the trial court noted the facts and attendant circumstances of the case, including the defendant's attempts to conceal

and cover up the crime. He concluded that a minimum sentence was not warranted. In light of the brutal nature of the murder, we cannot say that the trial court abused its discretion.

For all of the above-mentioned reasons, the judgments and sentences of the circuit court of Cook County are affirmed.

Affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.