THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ARTHUR G. ROBINSON, Defendant-Appellant.

First District (2nd Division)    No. 80-1235

Opinion filed December 22, 1981.

James J. Doherty, Public Defender, of Chicago (Emily Eisner and Aaron L. Meyers, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Theodore Fotios Burtzos, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DOWNING delivered the opinion of the court:

Defendant Arthur G. Robinson was charged by information with attempted murder (Ill. Rev. Stat. 1975, ch. 38, par. 8—4), armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2), unlawful restraint (Ill. Rev. Stat. 1975, ch. 38, par. 10—3), and three counts of aggravated battery (Ill. Rev. Stat. 1975, ch. 38, pars. 12—4(a), 12—4(b)(1)). At trial, defendant interposed the defense of insanity. (Ill. Rev. Stat. 1979, ch. 38, par. 6—2.) A jury found defendant not guilty of attempted murder, but guilty of all other charges. The trial court sentenced defendant to indeterminate sentences of 1 to 3 years for unlawful restraint, 3 to 10 years for aggravated battery, and 10 to 20 years for armed robbery.

Defendant asks this court to determine whether (1) the trial court erred in refusing defendant's pretrial motion for a separate trial on his claim of insanity; (2) he was denied an impartial jury when the trial court refused to ask the veniremen certain questions offered by defense counsel relating to the insanity defense; (3) certain allegedly erroneous evidentiary rulings prejudiced the insanity defense; (4) the State failed to prove defendant sane beyond a reasonable doubt; and (5) the trial court erred in tendering a certain instruction to the jury regarding the insanity defense.

On the evening of June 22, 1977, Jessie Carter was stabbed by defendant, forced into the trunk of his own car, and driven around parts of Chicago for several hours prior to making an escape. Several days later, defendant was arrested and charged with the offenses involved in this case.

Prior to trial, defense counsel requested a bifurcated trial so that he

could separately present the questions of self-defense and the defense of insanity, claiming that these defenses were antagonistic. The trial court denied the motion on the ground that these allegations were insufficient to warrant two separate proceedings.

Jury selection began on May 17, 1979. Defense counsel presented the court with seven questions he desired be asked of prospective jurors, aimed at determining the veniremen's thoughts about the insanity defense. The trial court ruled that only two of the questions could be asked. Although *voir dire* proceedings followed, this court has not been provided with a transcript or any other type of record of that phase of the trial.

At trial, victim Jessie Carter appeared at the behest of the State. On the evening of June 22, 1977, Carter was at a pool hall on the west side of Chicago. He left the hall at about 10 p.m. As he went to his car, Carter heard someone call his name. He looked up and saw defendant, whom he had seen occasionally before. Defendant asked Carter for a ride to defendant's home. Carter agreed, and defendant entered the car. At that time, defendant asked Carter if he had any money, and Carter stated that he did not. Defendant then asked Carter to perform an act of oral sex upon him and then pay defendant for it. Carter refused. Defendant then asked Carter to wait while he went back into the pool hall for a moment. Three or four minutes later, defendant reentered Carter's car and asked again for money. Carter repeated that he had none, and defendant pulled a knife. He grabbed Carter around the neck and stabbed him in the ribs. Defendant then told Carter to start driving. The two men drove for several minutes, then defendant instructed Carter to pull over. Carter got out of the car and was told to walk to the trunk. Defendant again requested Carter to perform the oral sex act, but Carter refused. Defendant then took Carter's money, about $2, and forced Carter into the trunk.

Defendant drove the car for about two hours, stopping on three occasions. Meanwhile, Carter was able to remove the trunk lock. On the last stop, as defendant approached the trunk, Carter quickly flipped the trunk lid open and swung at defendant with a tire jack, knocking the knife out of defendant's hand. Defendant ran and Carter yelled for help. Eventually, he spotted a police car and was taken to the hospital. Several days later, Carter learned defendant's full name and related it to the police. On cross-examination, Carter related that defendant was upset and excited at the time he stabbed Carter.

Officer Robert Thorne testified that he and his partner arrested defendant at his home on July 11, 1977. Thorne stated that defendant acted "normal for that area" when arrested, asking Thorne what he was being charged with. On redirect examination, Thorne stated that he averaged 80 arrests per month during his first six years on the force and 10 arrests per

month in the following two years. Over objection, Thorne noted that about 85% of those arrestees asked what they were arrested for.

At the conclusion of Thorne's testimony, the State rested its case in chief.

Defendant's sister, Ailene Robinson, testified to childhood life in the Robinson family. Robinson described her mother as very strict and domineering. She once punished defendant at the age of 10 by sending him to school dressed in girl's clothing. Defendant was sent to Chicago State Hospital, a mental institution, at that age. He spent over a year there. About two and then four years later, defendant was sent to Elgin State Hospital. In 1977, defendant was sent to the Madden Mental Health Center in Maywood.

Robinson related that defendant desired to be an artist. She was present when defendant tried to hang himself, and earlier when he jumped out of a window. Defense counsel attempted to ask Robinson about defendant's attitudes on homosexuality. The State's objections were sustained.

Dr. Victoria Orfei examined defendant at the Madden Mental Health Center on June 28, 1977, six days after he attacked Carter. She did not make a mental diagnosis. At the exam, defendant was in an agitated, uncooperative state. Defendant told Orfei that he had been attacked by a homosexual on the previous night and "was forced to drink an alcoholic beverage." Orfei diagnosed only hypertension.

The central witness to defendant's insanity claim was psychiatrist Marvin Ziporyn. Dr. Ziporyn has practiced psychiatry since 1955. He examined defendant once, for 45 minutes, on May 30, 1978. At that time, he had read reports on defendant's prior treatment at Madden, and at Elgin in 1963. Dr. Ziporyn stated that knowing a person's prior history is useful in determining his sanity. The examination of defendant was a standard psychiatric test involving an interview, a physical exam, and a formal mental status exam consisting of specific questions. During this procedure, there was "quite a bit" of discussion about homosexuality. Defendant told Dr. Ziporyn that he had been a constant target of homosexual attack or seduction throughout his life. Defendant said he found homosexuality to be very shameful, extremely distasteful, and unpleasant. Defendant did not specifically deny having engaged in homosexual acts.

During the exam, defendant told Dr. Ziporyn about his version of the events concerning Carter. Defendant stated that Carter made advances upon him, and that he had to defend himself with violence. Dr. Ziporyn did not believe that defendant's story was truthful. However, he did not find defendant to be deliberately or consciously attempting to fake a mental or other illness.

Dr. Ziporyn's analysis of the results of the exam indicated that de-

fendant engaged in defense mechanisms to handle his unacceptable strong homosexual desires. Defendant utilized the defense mechanism of projection, whereby he ascribed feelings he did not like about himself to others and transferred blame to those others. Dr. Ziporyn believed that defendant's problems existed since his childhood, and that he still had the problems. Defense counsel posed a hypothetical to the psychiatrist based upon all the relevant facts of this case. Based upon those facts, Dr. Ziporyn opined that defendant was suffering from a mental disease at the time of the incident which prevented him from appreciating the criminality of his conduct and from conforming his conduct to the requirements of the law. The psychiatrist's diagnosis was that defendant was then suffering from a paranoid state, a psychotic condition which involves heavy utilization of projection. Dr. Ziporyn believed defendant's suicide attempts were not a symptom of paranoia, but were the manifestation of the defense mechanism of introjection, whereby anger is turned inward against oneself. Introjection is usually seen hand-in-hand with projection. Paranoid individuals can also be expected to show signs of depression. Dr. Ziporyn's findings were inconsistent with a diagnosis that defendant was a sociopath, because defendant's actions evidenced pathology. It is not inconsistent for a paranoid person to engage in some rational behavior.

On cross-examination, Dr. Ziporyn admitted that two examiners could reach different conclusions concerning the same subject. The psychiatrist also stated that he had testified in criminal cases about 20 times in the prior year, more than half of the time for the State, though never for the State in Cook County proceedings. In 45-50% of the cases, Dr. Ziporyn testified that the person was insane. He stated that it is more difficult to determine the mental status of a person at a prior date on which he was not present.

At the conclusion of Dr. Ziporyn's testimony, the defense rested its case.

Dr. Jewett Goldsmith appeared for the State as a rebuttal witness. Dr. Goldsmith, a psychiatrist, examined defendant by order of the court in July 1978 to determine defendant's mental status at that time. He was not concerned with defendant's sanity at the time of the incident giving rise to this case. He diagnosed defendant as suffering from depressive reaction with anxiety at the time of the exam. He did not diagnose a paranoid state or any indication of psychotic behavior. On cross-examination, Dr. Goldsmith stated that the suspicion that defendant had repressed homosexual tendencies presented itself. Attempts by the defense to question the witness about "projection" were met by objections which were sustained.

Dr. Gerson Kaplan has practiced psychiatry since 1959. He stated that

he was not paid to make his testimony in court, but examined individuals and testified as to those exams as part of his duties with the Psychiatric Institute of Cook County. Dr. Kaplan examined defendant in November 1977, February and June 1978. The purpose of the initial exam was to determine defendant's fitness to stand trial and to render an opinion as to his sanity at the time of the offense. This exam took 45 minutes, consisting of questioning and observation. Dr. Kaplan viewed a psychological report of defendant made prior to that time. He related that it was easier to evaluate a person's sanity the closer the exam was to the time in question. Dr. Kaplan related that defendant did not indicate any depression or severe anxiety at the first exam. There was no evidence that defendant was psychotic; he had no bizarre mannerisms; and his behavior was "strikingly different" from that expected of one suffering from a paranoid state. Dr. Kaplan believed that defendant was able to appreciate the criminality of his actions and conform his behavior to the requirements of the law at the time of the offense. Defendant was diagnosed as an anti-social personality.

A similar exam was made in February 1978. At that time, Dr. Kaplan found no evidence whatsoever of psychosis or of severe depression. His diagnosis mirrored that of the first exam. Dr. Kaplan stated that an anti-social personality is not a mental disease which would excuse one's culpability for a crime. At the third exam in June 1978, Dr. Kaplan found defendant was never suffering from a paranoid state during the times involved in his examination process.

On cross-examination, Dr. Kaplan stated that he had testified in court several hundred times for both the State and the defense. On redirect, he related that when he "put all the information available together, [he saw] absolutely no evidence for a diagnosis of paranoid state."

Dr. Ernest Piron, a psychologist, was the State's final rebuttal witness. The defense objected to the presence of this witness but was overruled. Dr. Piron related that he conducted a psychological examination of defendant in November 1977. He found defendant to have an above average range of intelligence. Nothing in the testing indicated that defendant was suffering from a paranoid condition. On cross-examination, Dr. Piron stated that an intelligent person could suffer from a paranoid state.

I

Defendant argues that the circuit court erred in refusing his motion for a bifurcated trial on the defenses of insanity and self-defense.

As recognized by defendant, the constitution does not require a bifurcated trial in the situation where a defendant seeks to assert both a defense on the merits of a criminal action and a claim of absence of

culpability due to mental illness. As well, there is no statutory basis in Illinois providing for such a procedure. (*People v. Speck* (1968), 41 Ill. 2d 177, 206-08, 242 N.E.2d 208, *reversed on other grounds* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279; see also *People v. Newbury* (1972), 53 Ill. 2d 228, 236, 290 N.E.2d 592.) However, courts in other jurisdictions have recognized the possibility of substantial prejudice to a defendant where he is forced to proceed before a single fact-finder with such inconsistent defenses. (See *United States v. Taylor* (D.C. Cir. 1975), 510 F.2d 1283, 1289; *Holmes v. United States* (D.C. Cir. 1966), 363 F.2d 281, 282; *State v. Khan* (1980), 175 N.J. Super. 72, 83-84, 417 A.2d 585, 592.) We have previously commented upon the obvious inherent conflicts of resolving the innocence or guilt issue where the insanity defense is raised in the same proceeding as a defense on the merits. (*People v. Dread* (1975), 27 Ill. App. 3d 106, 115, 327 N.E.2d 175.) We believe the *theory* underlying our prior comments and this defendant's argument contains intrinsic merit.

■■ However, we note that those courts which have adopted the type of argument here propounded by defendant utilize a test to determine whether the particular case before them merits granting of a motion to bifurcate. Those courts require defendant to show on the record that he has both a substantial insanity defense *and* a substantial defense on the merits. (See *Contee v. United States* (D.C. Cir. 1969), 410 F.2d 249, 250; *Houston v. State* (Alas. 1979), 602 P.2d 784, 787.) Our examination of the record in this case indicates that defendant failed to make a proper showing of this nature to the trial court. We find no significant evidence which would support this defendant's assertion of self-defense. Consequently, while we recognize the merit in the theoretical aspect of defendant's contention, we cannot accept it for application in this particular set of facts. (See *State v. Sarinske* (1979), 91 Wis. 2d 14, 280 N.W.2d 725.) The trial court committed no error in denying defendant's motion to bifurcate.

## II

■■ Defendant asserts that he was denied an impartial jury when the trial court refused to ask prospective jurors several specific questions relating to the insanity defense which were proposed by the defense counsel.

The record before us contains a transcript of the conference at which defense counsel offered his *voir dire* questions to the trial court. The record shows that the court accepted two of those questions but rejected the remainder for various substantive reasons. By and large, defense counsel accepted the court's ruling without argument. Also, defense counsel asked the court whether there were "any other areas dealing with insanity that [the court] would allow [him] to question the jurors on." The

court responded, "I don't know." At this point, the court reporter was excused by agreement of the parties. We have no record of the *voir dire* proceedings, either verbatim transcript or a bystander's report.

In such circumstances, this court cannot assume merely on the representations of defendant that the trial court's *voir dire* examination failed to adequately inquire as to the possible prejudices the veniremen might have against the insanity defense. While it is undisputed that parties have the right to have jurors examined concerning their attitudes toward the insanity defense when such is involved in a case *(People v. Moore* (1972), 6 Ill. App. 3d 568, 571, 286 N.E.2d 6), the absence of a record of the *voir dire* makes it impossible for this court to find that this right of the parties was not upheld by the trial court in this case. See generally *People v. Bracey* (1981), 93 Ill. App. 3d 864, 870, 417 N.E.2d 1029.

## III

Defendant claims that several evidentiary rulings by the trial court were erroneous and require reversal for retrial.

### A.

Defendant contends that arresting officer Thorne's testimony that defendant appeared normal at the time of his arrest and that 85% of those he arrested ask the reason for their arrest was improper and prejudiced his insanity defense.

■■ A nonexpert, lay witness who has had an opportunity to observe an individual may give his opinion as to the latter's mental condition at that time so long as his testimony contains sufficient facts and circumstances forming the basis for the opinion. *(People v. Kuntz* (1977), 52 Ill. App. 3d 804, 809, 368 N.E.2d 114, *appeal denied* (1978), 67 Ill. 2d 594; see also *People v. Mahon* (1979), 77 Ill. App. 3d 413, 425, 395 N.E.2d 950.) The question of whether the witness has related sufficient underlying facts and circumstances to serve as a foundation for such testimony is for the trial court to decide, and that decision will not be altered in the absence of a showing of abuse of discretion. *(People v. Lechner* (1976), 35 Ill. App. 3d 1033, 1041, 342 N.E.2d 820, *appeal denied* (1976), 63 Ill. 2d 553.) In this case, the record makes clear that the testifying policeman was one of those who had arrested defendant. Certainly, he would have had the opportunity to observe defendant at that time. The officer also related that defendant asked the reason for his arrest, which the officer, an eight-year veteran who had made hundreds of arrests, found to be a typical query of an arrestee. Clearly, these facts and circumstances are adequate support for the officer's testimony as to defendant's apparent mental status at that time.

Defendant argues that the officer's statement concerning other

arrestees' actions constituted an improper reference to other criminal cases. Clearly, this facet of the officer's testimony was solely in the nature of foundation concerning his prior experience as a policeman and explaining *why* he believed that defendant's question made defendant appear normal to him. This testimony merely presented the necessary yardstick against which the jury could measure the witness' understanding of the term "normal." Thereafter, it was for the jury to assign weight to this testimony in light of this foundation and the remaining evidence of record. No prejudice to the insanity defense is evident therefrom.

## B.

Defendant urges that the trial court erroneously excluded the testimony of defendant's sister as to her knowledge of defendant's homosexuality.

This issue was not raised in defendant's post-trial motion for a new trial. Errors not so asserted are waived. (*People v. Dean* (1981), 99 Ill. App. 3d 999, 1004, 426 N.E.2d 279.) Given the amount of other expert testimony concerning defendant's homosexual tendencies and the relation thereof to his mental stability, this evidence would have been essentially cumulative in any event. This court thus need not address the question under the authority of the plain error rule. 73 Ill. 2d R. 615(a); see *People v. Baynes* (1981), 88 Ill. 2d 225, 231.

## C.

Defendant asserts that the trial court erred in preventing him from questioning one of the State's rebuttal witnesses about the psychiatric defense mechanism theory of "projection."

This issue was not raised in the post-trial motion and is waived. (*People v. Dean.*) Nothing in the record supports resort to the plain error rule in order to address the matter. *People v. Baynes.*

## D.

Defendant believes that the trial court should not have permitted the testimony of psychologist Piron to be admitted at trial.

■■ A properly qualified psychologist may testify as to the nature and results of psychological tests administered by him, particularly where those tests are performed at the request of a psychiatrist who uses them in making his diagnosis. This psychologist may also testify as to his opinion of the patient's mental condition. (*People v. Whitaker* (1980), 87 Ill. App. 3d 563, 567, 410 N.E.2d 166, *appeal denied* (1980), 81 Ill. 2d 605.) Here, Dr. Piron testified that he had a Ph.D. in psychology and has actively

practiced in that field for eight years. He stated that he put defendant through a standard psychological examination, and related some of the results. It is clear that Dr. Kaplan utilized the results of these tests in making his diagnosis. In these circumstances, Dr. Piron's testimony was clearly admissible. Defendant has misread *People v. Noble* (1969), 42 Ill. 2d 425, 248 N.E.2d 96, in citing it for the contrary proposition.

### E.

Defendant claims that the State improperly attempted to insinuate to the jury that its rebuttal witnesses were witnesses of the court and were thereby impartial.

This matter was not raised in defendant's post-trial motion and is therefore waived. (*People v. Dean.*) We also find no basis for addressing the question under the plain error rule. *People v. Baynes.*

### IV

Defendant argues that the State failed to prove beyond a reasonable doubt that he was sane at the time of the crimes.

■■■ Once a defendant introduces evidence which if believed creates a reasonable doubt that the defendant possessed the requisite mental capacity to be considered legally sane at the time he committed the alleged crimes, the State must prove beyond a reasonable doubt that the defendant was in fact legally sane at that time. (*People v. Foster* (1979), 76 Ill. 2d 365, 378-79, 392 N.E.2d 6.) The question of whether the defendant was in fact sane at the time of the offense is for the jury, and their decision will not be reversed unless it is palpably erroneous. *People v. Dread* (1975), 27 Ill. App. 3d 106, 113.

■■ In his brief, defendant presents an extremely long restatement of the testimony of the witnesses at trial concerning defendant's mental status on June 22, 1977. Most of the argument is concerned with the allegedly "overwhelming evidence" of defendant's alleged insanity, which evidence can only be found in the testimony of defendant's sister, a lay person, and Dr. Ziporyn, a psychiatrist. We see no useful purpose in further recitation of the evidence at this juncture. Examination of the record shows that the diagnosis of defendant's expert that defendant was insane on the subject date was contradicted by the testimony of the State's expert. In such circumstances, it was for the jury to resolve this evidentiary conflict. They did so, finding against defendant. Nothing in his argument to this court, which is in essence a closing argument to the jury, demonstrates that the factfinder's determination was palpably erroneous. Consequently, there exists in this record no reason for finding reasonable doubt as to defendant's sanity at the time he attacked Jessie Carter.

## V

Lastly, defendant asserts that the prosecution's instruction to the jury concerning the legal definition of insanity was erroneously tendered by the trial court.

The instruction in question is taken verbatim from Illinois Pattern Jury Instruction, Criminal, No. 24.01 (1968) (hereinafter cited as IPI Criminal). Defendant complains that the second paragraph of that instruction[1] "injected into the case the concept of anti-social conduct that was highly confusing and prejudicial in the context of this trial."

■■ Analysis of the record indicates that defendant did not object to the tender of this instruction during the instruction conference, and in fact relied upon the assumption that it would be tendered in objecting to another instruction. The failure to object at trial to an asserted error in a jury instruction waives the question. (*People v. Tannenbaum* (1980), 82 Ill. 2d 177, 180, 415 N.E.2d 1027.) Additionally, the Committee Note to the IPI instruction directs that the paragraph in question should be given when the evidence shows repeated criminal or other antisocial behavior. (IPI Criminal No. 24.01, Committee Note.) The evidence of record contained the testimony of Dr. Kaplan that defendant had an antisocial personality. Thus, the debated paragraph was properly included in the instruction. No error resulted in the giving of the entire IPI Criminal Instruction No. 24.01.

For all the above reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

HARTMAN, P. J., and PERLIN, J., concur.

---

[1] IPI Criminal No. 24.01 reads:
> "A person is insane and not criminally responsible for his conduct if at the time of the conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.
> [Abnormality manifested only by repeated criminal, or otherwise anti-social conduct, is not mental disease or mental defect.]" (Brackets in original.)