THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
HERSCHEL GLENN, Defendant-Appellant.

First District (1st Division)   No. 1—87—2524

Opinion filed August 24, 1992.

Randolph N. Stone, Public Defender, of Chicago (Frank Madea, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Marie Quinlivan Czech and Carol L. Gaines, Special Assistant State's Attorneys, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

After a jury trial in the circuit court of Cook County, defendant Herschel Glenn was found guilty of murdering (Ill. Rev. Stat. 1981, ch. 38, par. 9—1) and raping (Ill. Rev. Stat. 1981, ch. 38, par. 11—1) Lillian Final. Defendant received sentences of natural life and 30 years' imprisonment, respectively, on those convictions. Defendant's natural life sentence was predicated on a Kane County conviction involving the companion murder of James Wright.

Defendant makes the following allegations on appeal: (1) the State failed to prove defendant's sanity beyond a reasonable doubt; (2) the court erred when it refused to give defendant's tendered jury instruction on the consequences of a not-guilty-by-reason-of-insanity verdict; (3) the court erred when it allowed the State to present "other crimes" evidence; (4) the court erred when it denied defendant's motion to bifurcate the trial for separate hearings on the issues of insanity and guilt; (5) the court erred when it refused to give defendant's tendered jury instruction on voluntary intoxication where there was some evidence to support the giving of such instruction; (6) the court erred when it refused to allow a respiratory therapist's report to go to the jury room where such report supported defendant's insanity defense; (7) the State's violation of its discovery obligations denied defendant a fair trial when the State was allowed to present a psychologist's insanity opinion which had not been disclosed in the State's pretrial discovery responses; and (8) defendant's natural life sentence violates the separation of powers clauses of the Illinois and Federal Constitutions, violates Federal and State guarantees of due process and equal protection, and violates the eighth amendment's prohibition of cruel and unusual punishment. We affirm.

On the evening of May 7, 1982, defendant, an Elgin police officer, went to the Elgin Ramada Inn for a few drinks. Defendant's live-in girl friend, Robin Denise Mayo, did not accompany defendant.

Defendant remained at the Ramada Inn from 9 p.m. to 1:30 a.m. During this time, defendant ordered several drinks and made advances towards several of the Inn's female employees. Defendant followed one of the employees into the ladies room. Defendant was ultimately asked to leave the lounge. While in the lounge, defendant did not fall, lose his balance or appear intoxicated.

At approximately 1:30 a.m. the same evening, Lillian Final and James Wright left the home of Carolyn Miller in Wright's red El Camino to purchase pizza. Final and Wright never returned.

At approximately 2:45 a.m. the same evening, Elgin police officer John Darr was patrolling through Lord's Park in Elgin. He observed two vehicles; one vehicle, a red El Camino, had on its interior lights. Darr returned 20 to 25 minutes later and observed the same El Camino again. Darr ran a registration check on the vehicle and learned that it belonged to Spencer Wright. Darr searched the park area for the vehicle's occupants because the car's interior light remained on and the keys were in the ignition. Darr found a woman's purse on the passenger floor containing the identification of Lillian Final. Darr also found a jacket and wallet belonging to James Wright on the driver's seat.

At approximately 2:15 a.m., Ronald Begin, who lives one block from the Stewart Warner plant in Elgin, heard a series of gunshots. The Stewart Warner plant is three-fourths of a mile from defendant's apartment. Near that time, defendant returned to the apartment he shared with Mayo and told her he had been shooting raccoons. Defendant took off his shirt, and Mayo noticed that defendant's shirt was covered with blood. Defendant put on a clean shirt and got more bullets from the closet. Defendant then left and returned at 3:30 a.m. to go to sleep.

At approximately 3 to 3:30 a.m., Scott Burns and Charles Freeman were en route to Burns' house in Elgin when they saw a man, later identified as defendant, a car and a body near the "Skorberg" store. Defendant was standing over the body. When defendant saw them, he walked towards them, got in his car, and drove towards the body. Burns and Freeman went home, called the police and returned to the scene. Kathleen Iluebke, who lived 600 feet from the Skorberg store, testified that she heard a series of gunshots at 3:10 a.m. Robert McHenry, who lived nearby, also testified that he heard a series of gunshots coming from that area. The Skorberg store is approximately 2½ blocks from defendant's apartment.

Kane County police officer Joseph Chavez proceeded to the Skorberg store at approximately 3:58 a.m. on May 8, 1982. Upon his arrival, Skorberg found the lifeless body of a fully dressed, white male, whom Chavez later determined to be James Wright. The victim had received seven gunshot wounds, with three to the head and four to the right shoulder. The cause of death was determined to be multiple gunshot wounds to the head.

Defendant's Elgin police star and other identification were recovered within 12 feet of Wright's body. At 4:30 a.m., defendant telephoned the Elgin police department and reported his police badge missing. Elgin police officer James Kelly was dispatched to defend-

ant's home at this time. Kelly found defendant's car in the parking lot and noted that the car's hood was still warm.

At 6:30 a.m. on May 8, 1982, defendant was expected for roll call as he was on duty that day. When he failed to appear, Lieutenant Kelahan of the Elgin police department telephoned defendant, who said he would be in as soon as possible. Officer Kelly followed defendant from his home to the station. Upon defendant's arrival, fellow officers approached defendant and removed his gun and nightstick. Defendant later told Officer Kelly that he had a problem and was worried about getting in trouble with the department. Defendant told Kelly that he had gone to Lord's Park to the lower lagoon parking area and taken target practice on a large tree. Defendant later stated to another Elgin police officer that he had gone out drinking and was in the wrong place at the wrong time with the wrong people and was now in trouble. Defendant signed consent forms to search his car, apartment and locker.

After being apprised of his *Miranda* rights, defendant told Detective Robert Cannon of the Kane County sheriff's department that he had gone to the Ramada Inn on May 7, 1982, at approximately 7 to 7:30 p.m. Defendant socialized with acquaintances until about 2 a.m. At that time, he drove up and down Interstate 90 and then Route 25 and went home at 3 a.m. Defendant told Cannon that he carried a Beretta semi-automatic pistol while he was at the Ramada. When told his car had been spotted at the Skorberg store, defendant denied going behind the store, stating that he only passed by. When told that his badge had been found next to a homicide victim, defendant said he did not know where he had lost it. Ten minutes later, defendant told the detective that he wanted to tell him what really happened.

Defendant recounted that he left the Ramada at 2 a.m. and went home to exchange his .25 caliber for a .38 snubnose revolver. Defendant told his girl friend that he was going to shoot raccoons. Defendant then said that because he had no extra ammunition when he left for the park and had not hit any raccoons, he drove back to the east side of Elgin via Interstate 90. Along the way he picked up a white female hitchhiker, who was 19 years old, about 5½ feet tall, with shoulder-length brown hair, and wearing jeans and a flannel shirt.

They pulled into Skorberg's lot, where the girl performed oral sex upon defendant. When told that witnesses had seen a body, defendant replied, "they couldn't have seen the body *** because there was no body." Defendant then said that he dropped the girl off in Carpentersville and got home at 4 a.m. Defendant was then shown a photo of a

male victim, said he did not recognize him and later said, "I didn't smoke that guy."

At approximately 9 a.m. the next morning, Elmer Lauffenberger, a local farmer, was planting corn on land behind the west side of the Stewart Warner plant in Elgin. Lauffenberger discovered an unclothed female body in the field. The body had on socks and shoes, and there was something around the victim's neck. Lauffenberger called the police.

Elgin police detective Wayne Henke arrived at 10:45 a.m. and observed a female body lying on her back. A white bra was around her neck and assorted clothing lay near her body. The victim, identified as Lillian Final, had received three gunshot wounds to the head and one each to the abdomen and thigh. Blood and hair samples, as well as vaginal and rectal swabs, were recovered.

Kane County Sheriff's Detective Anderson proceeded to defendant's apartment, where he conducted a search as authorized by the consent-to-search form that defendant had previously executed. Anderson recovered a .38 snubnose revolver, a blue sport coat, beige jacket, jeans, a green sports shirt and a beige shirt. Anderson found in defendant's jeans pockets a Ramada Inn receipt, a live round of .38 caliber ammunition, and three spent .38 casings.

Ballistics evidence established that defendant's .38 caliber fired the bullets recovered from the bodies of both Wright and Final. This same gun also fired the spent cartridges recovered near the Stewart Warner building.

Forensic evidence established that there was no distinction between the blood and bodily fluids of defendant and Final; however, Wright's blood and fluids were distinguishable from those of defendant and Final. Tests conducted on defendant's bloodstained clothing revealed that the blood found thereon could not have come from defendant or Final. Many of the bloodstains on defendant's jacket and shirt were attributable to blood droplets flying through the air before coming into contact with defendant's clothing. Stains on defendant's jacket were caused by defendant's person physically contacting a bloody object. Sperm found on the vaginal swab and the semen present in the anal area of Final could not have come from Wright. However, defendant could not be excluded as the possible source of the semen. Finally, a Caucasian pubic hair found on defendant's underwear was consistent with Final's pubic hair.

After the State rested, defendant presented expert and lay testimony to establish that, as a result of exposure to carbon monoxide poisoning in February 1982, defendant was unable to conform his con-

duct to the law or appreciate the criminality of his actions on May 7, 1982.

On February 7, 1982, Elgin fire department paramedics were summoned to treat an individual who had been exposed to carbon monoxide. When paramedic Richard Wilkening arrived on the scene, he found defendant slumped over the wheel of his car. Defendant was conscious and able to answer questions although he was not completely coherent. Wilkening administered oxygen and defendant's condition improved. Defendant was hospitalized for several days and then released.

Harold Simpson, a respiratory therapist, testified that he drew arterial blood from defendant upon his admission to Sherman Hospital. Simpson tested the blood sample and determined that the amount of carbon monoxide in defendant's blood was 43, with the normal levels falling between 35 and 45. Simpson also testified as to defendant's oxygen saturation level, carbon monoxide level, and his "PO2" level, which reflects the amount of molecules adhering to red blood cells. Simpson did not explain whether any of these levels were normal or abnormal.

Members of defendant's family testified that following his exposure to carbon monoxide, defendant was not as relaxed as he used to be and appeared to be more jittery, anxious, nervous, short-tempered and insulting. Defendant sometimes complained of headaches and carried a bottle of Tylenol.

These witnesses admitted, however, that defendant never complained of memory problems, never had trouble operating a motor vehicle, nor did he exhibit any physical tremors or muscle contortions. Defendant had no problems with his balance and did not appear to be forgetful. Lieutenant Pfortmiller of the Elgin police department would later testify that between February 15, 1982 (when defendant returned to work), and May 7, 1982, he received no complaints from defendant's fellow officers concerning defendant's ability to recall things. Defendant was able to perform his functions as a police officer, never requested that he be taken off the streets, and never indicated that he had any problems with his duties. Defendant never requested a leave of absence for medical reasons.

Defendant's live-in girl friend, Robin Denise Mayo, testified that after defendant came home from the hospital, there was no change in his personality or behavior. Defendant did not complain of headaches or memory loss nor did he take excessive medicine for his headaches. Although defendant drank alcohol regularly and became aggressive when he drank, this conduct remained unchanged following his expo-

sure. During the months of February through May 1982, defendant went to work regularly and never complained about feeling sick, having spots in his eyes or pressure in his ears, or having any numbness or burning sensations. Defendant never required medical attention or lost consciousness.

Dr. Mohammed Sarwar, a neuroradiologist, testified that he interpreted the magnetic resonance image (MRI) scans taken of defendant's brain on September 25, 1986. Dr. Sarwar concluded that parts of defendant's brain had been affected by his exposure to carbon monoxide. Defendant specifically suffered damage to the left cerebral hemispheres, including the hippocampus. The damaged portion of defendant's brain is interconnected with the limbic system, which is involved in determining how emotion and behavior control rational behavior.

On cross-examination, Dr. Sarwar admitted that he only prepared a one-page report which excluded any reference to an injury to the hippocampus. Dr. Sarwar stated that he did not report damage to the hippocampus when he initially reviewed the scans. He also admitted that he did not review all the scans taken of defendant's brain, but limited his opinion only to the damaged parts.

Dr. Jonathon Pincus, a neurologist specializing in behavior neurology, testified that, after reviewing all the medical, hospital, and police reports, he concluded that defendant's brain was affected by carbon monoxide poisoning. Dr. Pincus reviewed the MRI scans and opined that the scans indicated that defendant's brain was affected by the carbon monoxide exposure. Dr. Pincus explained that the limbic system is a portion of the brain which relates to the control of violence and that carbon monoxide poisoning may result in a movement disorder. Dr. Pincus indicated that a person suffering from carbon monoxide poisoning is more sensitive to the effects of alcohol and may experience "pathological intoxication," which is a period of abnormal behavior where the intoxicated person has no recollection. It is possible, however, for this person to engage in goal-directed behavior during this period of time.

Dr. Pincus opined on cross-examination that defendant's psychological tests indicated that he was memory deficient and scored poorly on those tests designed to test his ability to remember. Dr. Pincus admitted on cross-examination that the damage to the brain was to the center portion (basil ganglia) and that he was not aware of the damage to the hippocampus until Dr. Sarwar told him. Dr. Pincus expected that a person suffering from carbon monoxide poisoning would show some memory deficiency on the job and have problems retracing

routes to familiar locations. Dr. Pincus further admitted that the damaged portions of defendant's brain were capable of being organized at a later date and that defendant's neurological condition did not continue to deteriorate after May 7-8, 1982. Dr. Pincus admitted that it would be easy for defendant to fake memory loss. Dr. Pincus never talked to defendant or the people who were living with him following his exposure.

Dr. Marvin Schwar, a psychiatrist with experience in carbon monoxide poisoning, testified that, after reviewing the medical, police, and hospital reports, he believed that defendant was suffering from organic brain disease with psychotic features. Defendant also had some borderline personality structure. As a result, Schwar believed that defendant was suffering from a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct, and was unable to conform his conduct to the requirements of the law.

When Dr. Schwar interviewed defendant in jail, defendant was unable to provide any memory of the crimes and could not give details. According to Schwar, defendant was unable to control his impulses or exercise good judgment at the time the crimes occurred. Schwar admitted that other experts do not consider organic brain syndrome to be a mental illness. Although Schwar diagnosed defendant as such, he admitted that defendant never received any psychiatric or psychological counseling following the murders, nor did defendant exhibit any bizarre behavior during his incarceration.

Schwar believed that defendant was acting in a "fugue" state at the time of the offense, which occurs when one loses touch and then returns to reality. Schwar opined that defendant was confused on the night of the crimes and exhibited poor judgment. While Schwar believed that defendant had a bad temper which caused him to react with anger when rejected, he was still capable of engaging in goal-directed behavior, *i.e.*, shooting two people after loading a gun, firing it, reloading it and firing it again.

Dr. Lawrence Heinrich, an expert in psychology, testified that he administered a battery of psychological tests to defendant on April 4, 1986. Heinrich additionally examined defendant, read the medical, police, and hospital reports and concluded that defendant was suffering from organic toxic brain syndrome, which caused him to have a psychotic episode at the time of the incident. Based on the tests administered, Heinrich opined that defendant had trouble with his short-term memory, which was influenced by brain damage. Defendant told Heinrich that he suffered from headaches and dizziness, a factor upon which Heinrich relied. Heinrich further diagnosed defendant as having

a borderline personality, meaning that defendant functioned very well at times, while at other times he was disturbed, albeit briefly or momentarily. Heinrich concluded that organic brain syndrome and borderline personality disorder are recognized mental diseases or defects which rendered defendant incapable of understanding the criminality of his act or conforming his conduct to the requirements of the law.

Heinrich admitted that merely because a person can erupt violently without warning does not mean he is suffering from a mental disease or is unable to conform his conduct to the requirements of the law. Heinrich acknowledged that his report merely stated that defendant had some type of personality disorder without making reference to his ability to conform his conduct to the law.

In rebuttal, the State presented the testimony of Drs. Helge Frank and Harry Gunn. Frank, a neurologist and brain wave specialist, testified that he had previously examined 50 to 60 carbon monoxide patients. Frank explained that not everyone who is exposed to carbon monoxide suffers brain damage as a result. He stressed that the determination of whether a person is affected by carbon monoxide poisoning involves consideration of his mental, motor, coordination and sensory conditions. A person suffering from carbon monoxide poisoning would have difficulty in reasoning, problem solving, understanding, interpreting, calculating or handling his affairs. Additionally, the person would not be able to think well or reason well, and would have both mental and memory problems. According to Frank, such a condition would be easily detectable by people who saw defendant on an everyday basis. Frank concluded that defendant had moderate exposure to carbon monoxide from which he suffered no permanent brain damage.

Regarding the MRI scans relied on by the defense experts, Frank testified that the set of scans was not complete and excluded a slice of the coronal section which portrayed a different angle of the hippocampus. According to Frank, the MRI scans showed no damage to the hippocampus which usually would appear in a person who suffered severe exposure to carbon monoxide. Frank testified that without a normal hippocampus, a person would not remember one minute to the next or have the ability to add simple digits. Frank concluded that there was no evidence that defendant's conduct was the result of neurological dysfunction.

Dr. Gunn, a clinical psychologist, interviewed defendant in 1979 and again in January 1983. During the 1983 evaluation, Gunn administered a series of psychological tests. Overall, the test results showed that defendant suffered no permanent brain damage. Over objection,

Gunn opined that defendant was not suffering from a mental disease or defect and, despite his manipulative, distrustful and self-centered character traits, defendant had the ability to conform his conduct to the requirements of the law and appreciate the criminality of his acts. Gunn acknowledged on cross-examination that he did not review the police reports or the reports of the defense experts in reaching his opinion.

In surrebuttal, Dr. Frank Lorimer, a psychiatrist, testified that, based on his three interviews with defendant, defendant was suffering from an organic mental disorder at the time of the murders. Lorimer believed that defendant had a memory disturbance which caused him to "cofabulate" (identify wrong event with wrong date) when answering particular test questions. According to Lorimer, defendant had no recollection of committing the crimes. Lorimer opined that defendant's rage center could have been set off by seeing a couple engaged in sexual activity. This, in turn, would set off a sexual urge in defendant causing him to enter a rage state, during which he would not remember what happened.

Lorimer could not explain why defendant did not embark on a rage attack while at the Ramada Inn. Rather, Lorimer believed that defendant's rage attack began around 1 to 2 a.m., when defendant's memory became fuzzy, and ended when defendant went to sleep. According to Lorimer, defendant told him the last thing he remembered was being at home, getting a .38 caliber gun and extra shells, and then leaving for Lord's Park. Lorimer measured the duration of defendant's rage state based only on defendant's statements. Lorimer never spoke to Robin Denise Mayo.

Defendant rested in surrebuttal. Following closing argument and jury instructions, the jury found defendant guilty of rape and murder. Defendant was subsequently sentenced to natural life for murder and 30 years for rape. This appeal followed.

Defendant's first contention on appeal is that the State failed to rebut beyond a reasonable doubt his evidence that he was legally insane at the time he committed the offenses at issue. Defendant recognizes, as he must, that insanity is typically an issue for the trier of fact to resolve and that this determination is given great deference on review. Nevertheless, to defeat the verdict, defendant attacks the State's expert testimony on the sanity issue by claiming it lacks factual and scientific support. Simultaneously, defendant recites his own expert and lay evidence and claims it to be overwhelming.

Defendant's insanity defense is predicated on section 6—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 6—2), which provides:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

In Illinois, all persons are presumed sane. (*People v. Silagy* (1984), 101 Ill. 2d 147, 168, 461 N.E.2d 415, 425, *cert. denied* (1984), 469 U.S. 873, 83 L. Ed. 2d 156, 105 S. Ct. 227.) To raise the affirmative defense of insanity, a defendant must present some evidence thereon. (*Silagy*, 101 Ill. 2d at 168, 461 N.E.2d at 425; Ill. Rev. Stat. 1981, ch. 38, par. 3—2(a).) Once raised, the State must sustain the burden of proving the defendant guilty by establishing beyond a reasonable doubt that the defendant was sane at the time of the offense. (*Silagy*, 101 Ill. 2d at 168, 461 N.E.2d at 425; Ill. Rev. Stat. 1981, ch. 38, par. 3—2(b).) Whether the State carried its burden is a question of fact, and the jury's determination will not be reversed unless it is so improbable or unsatisfactory as to create a reasonable doubt as to defendant's sanity or so palpably erroneous as to suggest its basis as passion or prejudice. *Silagy*, 101 Ill. 2d at 169, 461 N.E.2d at 425.

In determining the question of sanity, the weight to be given an expert opinion depends upon the reasoning and factual details used to support that opinion (*People v. Williams* (1990), 201 Ill. App. 3d 207, 216, 558 N.E.2d 1258, 1264), and a trier of fact may accept one expert opinion over another, conflicting expert opinion. (*Williams*, 201 Ill. App. 3d at 216, 558 N.E.2d at 1266.) Lay witnesses may also express their opinions as to sanity if the opinions are based on personal observations and encounters with the accused. (*Williams*, 201 Ill. App. 3d at 219, 558 N.E.2d at 1266; *People v. Tylkowski* (1988), 171 Ill. App. 3d 93, 99, 524 N.E.2d 1112, 1117.) Lay opinions are especially relevant on the issue of sanity if they are based on observations made at the time immediately preceding the criminal acts in question. (*Williams*, 201 Ill. App. 3d at 219, 558 N.E.2d at 1266.) Significantly, a jury may reject all expert testimony and conclude that defendant was sane based solely on lay testimony. *Williams*, 201 Ill. App. 3d at 219, 558 N.E.2d at 1266.

■ In this case, we believe the jury's verdict is supported by the evidence. Dr. Frank testified for the State that the MRI scans taken of defendant's brain showed no damage to the hippocampus, which usually would appear in a person suffering from severe exposure to carbon monoxide. Frank explained that without a normal hippocampus, a person would be unable to remember one minute to the next or reason well and would have difficulty in reasoning, interpreting, calculating, or handling his affairs. According to Frank, this condition would be easily detectable by people who saw defendant on an everyday basis.

The lay witnesses who testified corroborate Frank's opinion that defendant suffered no brain damage from his exposure. The testimony of these same witnesses simultaneously undermines defendant's expert testimony that defendant in fact suffered brain damage. Mayo, defendant's live-in girl friend, noticed no change in defendant's personality or behavior. Defendant also was able to perform his functions as a police officer. While defendant's lay witnesses testified to certain behavioral changes after defendant's exposure, none of these witnesses testified to changes which were compatible with extreme levels of carbon monoxide exposure. The lack of such testimony from either parties' lay witnesses undermines the defendant's expert testimony that defendant suffered brain damage.

In summary, while any police officer's sudden and inexplicable killing spree is difficult to comprehend in any case, the jury was presented with a question of fact which it chose to resolve against defendant. We will not disturb the jury's verdict on appeal.

Defendant's second contention on appeal is that the circuit court erred in failing to instruct the jury with defendant's tendered instruction regarding the consequences of a not-guilty-by-reason-of-insanity (NGRI) verdict. The tendered and rejected instruction provided as follows:

> "If you find that the defendant has not been proved sane beyond a reasonable doubt, there will be a presumption that his insanity continues. It will then be up to the court to determine whether the defendant will be hospitalized. You should not give any consideration to these questions."

Relying on non-Illinois cases which endorse the giving of a consequence instruction, as well as the reasoning of *People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146, *cert. denied* (1988), 488 U.S. 910, 102 L. Ed. 2d 252, 109 S. Ct. 264, which approved the giving of a consequence instruction in a death penalty hearing situation, defend-

ant asserts that the refusal to give the tendered instruction entitles him to a new trial. We disagree.

Our supreme court has yet to address the issue of whether a consequence instruction is required in insanity cases although numerous appellate courts have. In *People v. Meeker* (1980), 86 Ill. App. 3d 162, 407 N.E.2d 1058, the appellate court first addressed the issue. There, the tendered instruction provided:

> "If the defendant is found not guilty by reason of insanity, a hearing shall be held pursuant to Illinois statute to determine whether the defendant is in need of mental treatment." *Meeker*, 86 Ill. App. 3d at 169, 407 N.E.2d at 1065.

In rejecting the argument that a consequence instruction should be given as a general rule in all insanity cases, as well as in close cases, the court opined that such an instruction invited the jury to be influenced by the consequences of its verdict and to reach compromise verdicts. (*Meeker*, 86 Ill. App. 3d at 170, 407 N.E.2d at 1065.) While the court recognized that other jurisdictions have found persuasive the argument that such an instruction is necessary to forestall an otherwise uninstructed jury from convicting merely to prevent an insanity defendant from returning to the streets, the court found more persuasive the reasons against requiring that such an instruction be given. The court also noted that the then-in-effect Illinois statute dealing with post-verdict consequences in insanity cases (see Ill. Rev. Stat. 1979, ch. 38, par. 1005—2—4) "present[ed] a major obstacle to formulation of an instruction concerning consequences." (*Meeker*, 86 Ill. App. 3d at 171, 407 N.E.2d at 1065.) For these reasons, *Meeker* rejected the proposition that a consequence instruction should be given as a general rule in insanity cases.

While *Meeker* refused to adopt any general rule, it noted that one State (Indiana) had carved a very narrow, "special circumstances" exception, in which the giving of a consequence instruction is proper where a direct comment by the prosecutor plants an erroneous view of the law in the minds of the jury. (*Meeker*, 86 Ill. App. 3d at 171, 407 N.E.2d at 1066; see also *People v. Hebein* (1982), 111 Ill. App. 3d 830, 444 N.E.2d 782 (reviewing current status of Indiana law on exception).) As *Meeker* found no special circumstances to warrant an instruction, it affirmed the trial court's rejection of the tendered instruction.

To date, no Illinois case has deviated from the general rule founded by the *Meeker* court. Although more States have come to an opposite conclusion since the time *Meeker* was decided, *Meeker* nevertheless reflects the slight majority opinion on the issue. See Annot.,

81 A.L.R.4th 659 (1990); Comment, *The Not Guilty By Reason of Insanity Verdict: Should Juries be Informed of Its Consequences?* 72 Ky. L.J. 207 (1983-84).

██ For the reasons stated in *Meeker*, we adhere to the rule that a consequence instruction need not be given as a matter of course in all insanity cases. We agree that such an instruction will not as a matter of course result in the jury reaching a true and correct verdict in all cases. Accordingly, we reject defendant's argument that the court erred in denying his tendered instruction. Moreover, as defendant does not cite to any prosecutorial comment on the consequences of a NGRI verdict, we need not address whether "special circumstances" exist to justify the giving of such an instruction.

Relying on *Gacho* (122 Ill. 2d 221, 522 N.E.2d 1146), defendant contends that the rationale underlying *Meeker*'s rejection of a general rule has been weakened. We disagree.

In *Gacho*, the court held that a capital sentencing jury in a multiple murder case must be instructed that if they find sufficient mitigating factors to preclude the imposition of death, the defendant will be sentenced to natural life without the possibility of parole and can only be freed by executive clemency. (*Gacho*, 122 Ill. 2d at 262, 522 N.E.2d at 1166.) We find *Gacho* unpersuasive support for defendant's argument.

The analysis in *Gacho* began with a standard Illinois Pattern Jury Instruction which inaccurately informed the jury in a death penalty case that the defendant would be sentenced to "imprisonment" in the event the jury refused to impose the death sentence. The court found this instruction defective as a double-murder defendant in Illinois must be sentenced to natural life imprisonment. Accordingly, the court required future juries to be instructed with an instruction which reflected that natural life imprisonment was the only sentencing alternative to death in double-murder cases, except through executive clemency. *Gacho*, 122 Ill. 2d at 260-62, 522 N.E.2d at 1166.

While admittedly *Gacho*'s reasoning centered on the existence of juror misconceptions about parole law in death penalty cases, and while misconceptions may exist in insanity cases as well, *Gacho*'s persuasiveness ends there. *Gacho* dealt with a jury empanelled to impose sentencing, not a jury selected to determine guilt or innocence as in insanity cases. In modifying the instruction, the court was persuaded that the jury, which again was empanelled to impose sentencing, was entitled to be fully instructed as to sentencing options in a capital case. We believe that *Gacho* cannot be cited for the proposition that an insanity jury should also be fully instructed on sentencing options

as it has not been empanelled to decide sentencing. Moreover, *Gacho* modified an existing pattern jury instruction which the court found to be deficient. Here, no such pattern jury instruction exists. Accordingly, *Gacho* does not persuade us to deviate from the holding of *Meeker.*

Defendant's third contention is that the circuit court erred in allowing the jury to hear evidence relative to the murder of James Wright. Defendant claims the photographs of James Wright and the other testimony concerning his murder served only to show defendant's propensity to commit crime. We disagree.

Generally, evidence of other crimes is inadmissible if relevant merely to establish a defendant's propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, 823, *cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145.) Evidence of the commission of other crimes is admissible, however, when such evidence is relevant to prove any purpose other than propensity to commit crime, such as *modus operandi*, intent, motive, or absence of mistake. (*McKibbins*, 96 Ill. 2d at 182, 449 N.E.2d at 824; *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 484-85, 485 N.E.2d 1292, 1296.) It is within the sound discretion of the trial court to determine whether evidence of other crimes is relevant to a material issue and whether the probative value of such evidence outweighs its prejudicial impact; this determination will be overturned only if there exists a clear abuse of discretion. *People v. Fuller* (1983), 117 Ill. App. 3d 1026, 1036, 454 N.E.2d 334, 342-43.

In this case, the murders of Lillian Final and James Wright were closely connected. Final was Wright's girl friend and was seen leaving the home of Carolyn Miller with Wright on the night of the murders. Final's purse was found on the front seat of Wright's unoccupied car. Wright and Final suffered multiple gunshot wounds from defendant's gun. In short, the evidence not only placed defendant in the general vicinity of both killings, but showed that defendant killed two persons, who were last seen together, with the same weapon and within a short time frame.

Given the connection between Final's and Wright's murders, it is difficult to imagine the State's *prima facie* case being presented to the jury without reference to Wright's murder. More importantly, defendant placed his state of mind at issue when he raised his insanity defense.

Where a defendant's sanity is in issue, great latitude is allowed in admitting evidence relating to mental condition because, rather than an isolated cross-section of a single series of acts, one " ' "must ex-

amine the person, his history, his relationship with the victim, prior mental illnesses and other intervening factors of causation." ' " (*People v. Fields* (1988), 170 Ill. App. 3d 1, 14, 523 N.E.2d 1196, 1205, quoting *People v. Vanda* (1982), 111 Ill. App. 3d 551, 556, 444 N.E.2d 609, 614, quoting *People v. Haun* (1966), 71 Ill. App. 2d 262, 268, 217 N.E.2d 470, 473.) Indeed, practically every event in a defendant's life is relevant when the defendant interposes an insanity defense, including the defendant's criminal history. (*Fields*, 170 Ill. App. 3d at 13-14, 523 N.E.2d at 1205.) Additionally, an expert may be cross-examined for the purpose of explaining, modifying, or discrediting the expert's testimony and to ascertain what factors were taken into account and what ones were disregarded in arriving at a conclusion. *Fields*, 170 Ill. App. 3d at 14, 523 N.E.2d at 1205; *People v. Martinez* (1980), 86 Ill. App. 3d 486, 490-91, 408 N.E.2d 358, 362.

Here, the sequence of events on the night of the murder, including the details of Wright's murder, was relevant to show that defendant acted with intent, design and knowledge. (Accord *People v. Whitehead* (1988), 171 Ill. App. 3d 900, 907, 525 N.E.2d 1084, 1088 (defendant's threatening of victim with vase months prior to her killing relevant to rebut insanity and intoxication defenses).) A limiting instruction tailored to this end was given to the jury. Moreover, evidence regarding Wright's murder could be explored on cross-examination of the parties' experts as clearly the experts considered the night's sequence of events in formulating their opinions. For these reasons, the admission of evidence relative to Wright's murder was not error.

■ Defendant's fourth contention on appeal is that the circuit court abused its discretion in denying his pretrial motion to bifurcate his trial into one which first made a general determination of his guilt and then, a second, before a separate jury, which focused on defendant's insanity defense. Defendant asserts that the simultaneous trial of both issues prejudiced him in that a sufficiency argument and an insanity defense are inherently conflicting, antagonistic and confusing to a jury. Defendant further asserts prejudice by claiming the conflicting nature of this dual defense posture compelled him to forego altogether the presentation of a sufficiency argument and to present, instead, only an insanity defense.

In *People v. Speck* (1968), 41 Ill. 2d 177, 206-08, 242 N.E.2d 208, 224, *rev'd on other grounds* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279, our supreme court recognized that "[t]here is no statutory authority for [a bifurcated trial] in this State and the uniform practice has been to submit the issue of insanity at the time of the

crime to the same jury which hears the principal case." While *Speck* acknowledged cases from other jurisdictions which indicated that a two-stage trial may be proper in a certain case, *Speck* noted that no such authority held that an accused is *constitutionally* entitled to a bifurcated trial. *Speck* similarly refused to find a constitutional entitlement.

Appellate court cases subsequent to *Speck*, while sympathizing in theory with the defense posture dilemma the typical insanity case creates, have adhered to that decision. (*People v. Alerte* (1983), 120 Ill. App. 3d 962, 458 N.E.2d 1106; *People v. Robinson* (1981), 102 Ill. App. 3d 884, 429 N.E.2d 1356; *People v. Dread* (1975), 27 Ill. App. 3d 106, 327 N.E.2d 175.) *Robinson* took the *Speck* analysis one step further and noted that the other jurisdictions, to the extent they allow bifurcated trials, require a defendant to show first "that he has both a substantial insanity defense *and* a substantial defense on the merits." (Emphasis in original.) (*Robinson*, 102 Ill. App. 3d at 890, 429 N.E.2d at 1361.) No Illinois court to date has accepted a defendant's argument that the failure to bifurcate entitled the defendant, on the ground of prejudice, to a new trial.

Because defendant in this case lacked a substantial defense on the merits, we hold that the circuit court did not abuse its discretion in denying defendant's motion to bifurcate his trial. Clearly, significant evidence existed on the merits to convict defendant beyond a reasonable doubt. Accordingly, because this was not a closely balanced case, the fact that defendant had to surrender a theoretically conflicting sufficiency argument with his insanity defense does not require reversal. For these reasons, we reject defendant's argument.

Defendant's fifth contention on appeal is that the circuit court abused its discretion in refusing to instruct the jury on voluntary intoxication where some evidence existed that defendant was so intoxicated that his mental state was negated. The State responds that the only intoxication evidence which existed was merely that defendant had been drinking and, consequently, no evidence existed as to require the giving of a voluntary intoxication instruction. We concur with the State's argument.

Voluntary intoxication is available as a defense to a specific intent offense where its effect is to negate the defendant's mental state where such mental state is an element of the offense. (*People v. Camp* (1990), 201 Ill. App. 3d 330, 335, 559 N.E.2d 26, 29.) A trial judge has the discretion to refuse to tender a defense instruction on intoxication where there is insufficient evidence for a jury to reasonably find that the defendant was so intoxicated at the time of the crime that he

lacked the requisite mental state for the crime. (*People v. Arnold* (1984), 104 Ill. 2d 209, 214, 470 N.E.2d 981, 984.) Mere evidence that defendant had been drinking is insufficient to require that an instruction on intoxication be given; rather, the evidence must show that defendant was so intoxicated as to negate the requisite mental state for the crimes committed. *Arnold*, 104 Ill. 2d at 214, 470 N.E.2d at 984; *Camp*, 201 Ill. App. 3d at 335, 559 N.E.2d at 29.

To support his contention that a voluntary intoxication instruction was required, defendant directs this court to the evidence that he was drinking from 9 p.m. to 1:30 a.m. at the Ramada Inn and that he had two rum and Cokes prior to going out. Defendant also notes Officer Kelly's testimony that defendant smelled of alcohol the next day, and the testimony of Dr. Pincus regarding the heightened effects of alcohol upon an individual poisoned by carbon monoxide.

The State in response concedes this evidence, but contends no evidence exists to show that defendant was *so* intoxicated as to suspend all reason. The State points to the evidence that, while at the Ramada Inn, defendant did not fall, lose his balance or become rowdy. The State also notes the circuit court's observation that no witness testified as to the quantity of alcohol defendant consumed over the course of the evening. Accordingly, the State argues, the court did not abuse its discretion in refusing to give a voluntary intoxication instruction.

■ We believe the circuit court did not abuse its discretion in denying defendant's voluntary intoxication instruction. While the evidence showed defendant to have been drinking, no evidence of the extent of defendant's intoxication was elicited. Absent evidence showing defendant to have achieved the requisite level of intoxication to justify an instruction, no instruction was required.

Defendant's sixth contention on appeal is that the circuit court abused its discretion in refusing to allow defense exhibits 15 and 15A to go to the jury room. We disagree.

Harold Simpson, a respiratory therapist, testified regarding the amount of carbon monoxide and oxygen levels in defendant's blood following his exposure. Simpson prepared defendant's exhibit 15, a blood-gas report, which contained various numbers pertaining to defendant's blood. Both parties' experts reviewed this report in formulating their insanity opinions. Subsequently, the court addressed whether exhibit 15 and exhibit 15A, a blow up of exhibit 15, were to be admitted into evidence and, if so, whether each could go into the jury room. The court admitted both into evidence but refused to allow either to go to the jury room. The court, however, did allow defendant to display both exhibits to the jury during closing argument. Defend-

ant contends the court's action, in refusing to allow the jury to have these exhibits, "deprived the jury of full information to decide [the existence of] damage to defendant's brain and the subsequent issue of insanity."

The decision as to which evidentiary items should be taken to the jury room rests within the sound discretion of the trial court, whose discretion will not be disturbed absent a showing of prejudicial abuse. (*People v. Williams* (1983), 97 Ill. 2d 252, 292, 454 N.E.2d 220, 239, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364.) Here, defendant was allowed the full opportunity to develop the information contained in the blood-gas report. His expert witnesses, as well as the State's, addressed the numbers contained in the report and how these numbers impacted the ultimate issue of defendant's sanity. Moreover, defendant was given full opportunity to argue and display these exhibits during closing argument. It is difficult to imagine how a technical document which contains various numbers could possibly aid the jury where the jurors would have nothing but their collective memories on which to rely in deciphering the correlative meaning of the numbers. Clearly, defendant got nearly every benefit from the exhibits, as the jury was fully informed as to the numbers contained in the report and their respective meaning on the ultimate issue of sanity. No abuse of discretion has been shown.

Defendant's seventh argument on appeal is that the court abused its discretion in allowing Dr. Harry Gunn to testify for the State in rebuttal, where the State failed to disclose to defendant that Gunn had an opinion regarding defendant's sanity as required by Supreme Court Rule 412(a)(iv) (134 Ill. 2d R. 412(a)(iv)). Defendant apparently argues, in addition, that Gunn's testimony should have been stricken because Gunn relied only on his examinations of defendant in rendering his opinion and did not review any of the other reports of doctors or police officials.

We reject defendant's argument. Supreme Court Rule 412(a)(iv) (134 Ill. 2d R. 412(a)(iv)) requires the State to disclose to defendant:

> "any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons, and a statement of qualification of the expert."

As the rule indicates, the State need not disclose the fact that the expert has an opinion, only the expert's reports and statements. No authority exists to support defendant's assertion that the mere existence

of an opinion, which is not embodied in a report or statement, must be disclosed.

Here, prior to trial, the State disclosed to defendant its witness list. Dr. Gunn was included on this list. Gunn's written report regarding his examination of defendant was tendered to defendant prior to trial, and Gunn was subject to cross-examination regarding his report and opinion.

Defendant seems to argue that the State was required to disclose the existence of Gunn's opinion on the ground that it was an oral statement. To the extent this is a valid legal argument, and to the extent the State failed to disclose it in violation of Rule 412(a) or other court order, little or no prejudice resulted to defendant. Gunn was subject to cross-examination, during which he admitted that his opinion did not include an examination of police reports or the reports of experts. This failure on Gunn's part, however, went to the weight of his testimony, not its admissibility. Accordingly, defendant's arguments are without merit.

Defendant's eighth and ninth contentions on appeal relate to his natural life sentence imposed under section 5—8—1(a)(1)(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(c)). Defendant advances numerous arguments.

First, defendant contends that this section, which *mandates* the imposition of a natural life sentence *solely* upon conviction of two or more murders, violates the separation of powers clauses of the Illinois and United States Constitutions.

Second, defendant contends that when section 5—8—1(a)(1)(c) is read together with 5—8—1(a)(1)(b), which grants *discretion* to a trial judge to impose a natural life sentence in double-murder conviction situations where the intent to kill more than one person is present, a constitutional infirmity arises. Defendant particularizes this infirmity by asserting that, because section 5—8—1(a)(1)(c) mandates a natural life sentence regardless of criminal intent in a double-murder situation, and because section 5—8—1(a)(1)(b) grants discretion to the court in imposing a natural life sentence where intent to kill more than one person exists, a potential exists that a less culpable defendant may be sentenced more harshly under section 5—8—1(a)(1)(c) than a more culpable defendant under section 5—8—1(a)(1)(b). Consequently, defendant asserts the sentencing scheme violates the due process and equal protection clauses of the Illinois and Federal constitutions.

Finally, defendant contends that his natural life sentence under section 5—8—1(a)(1)(c) violates the cruel and unusual punishment provision of the Federal Constitution.

■ We reject all of defendant's sentencing arguments and affirm defendant's sentence. Regarding defendant's separation of powers argument, *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059, is dispositive. In *Taylor*, our supreme court specifically rejected a separation of powers clause argument as applied to section 5—8—1(a)(1)(c). (*Taylor*, 102 Ill. 2d at 209, 464 N.E.2d at 1064; accord *People v. Rodriguez* (1985), 134 Ill. App. 3d 582, 480 N.E.2d 1147.) Defendant's argument that section 5—8—1(a)(1)(c), a State statute, somehow violates *Federal* separation of powers principles is theoretically infirm. Similarly, because a separation of powers argument is not defendant specific, but rather deals with the interrelation of co-equal branches of government, defendant cannot argue that section 5—8—1(a)(1)(c) violates separation of powers as to him.

■ Regarding defendant's equal protection and due process arguments, this court in *People v. Fauntleroy* (1991), 224 Ill. App. 3d 140, 166, 586 N.E.2d 292, 309, recently rejected the argument that a violation of the due process and equal protection clauses resulted because sections 5—8—1(a)(1)(b) and 5—8—1(a)(1)(c) provided the potential for a less culpable defendant to receive a greater sentence than a more culpable one. Other cases have rejected similar due process and equal protection arguments. See *People v. McCleary* (1990), 208 Ill. App. 3d 466, 567 N.E.2d 434; *People v. Williams* (1989), 205 Ill. App. 3d 751, 563 N.E.2d 762; *People v. Matthews* (1990), 205 Ill. App. 3d 371, 562 N.E.2d 1113; *People v. Gant* (1990), 202 Ill. App. 3d 218, 559 N.E.2d 923; *People v. Winchel* (1987), 159 Ill. App. 3d 892, 512 N.E.2d 1298; *People v. Rodriguez* (1985), 134 Ill. App. 3d 582, 480 N.E.2d 1147.

■ Regarding defendant's cruel and unusual punishment argument, this court has rejected this argument. (*McCleary*, 208 Ill. App. 3d 466, 567 N.E.2d 434; *Williams*, 205 Ill. App. 3d 751, 563 N.E.2d 762; *Matthews*, 205 Ill. App. 3d 371, 562 N.E.2d 1113; *Gant*, 202 Ill. App. 3d 218, 559 N.E.2d 923; *People v. Gindorf* (1987), 159 Ill. App. 3d 647, 512 N.E.2d 770; *Rodriguez*, 134 Ill. App. 3d 582, 480 N.E.2d 1147.) Moreover, the United States Supreme Court recently affirmed, on eighth amendment grounds, a natural life sentence imposed on a Michigan defendant who was convicted for possessing 672 grams of cocaine. (*Harmelin v. Michigan* (1991), 501 U.S. 957, 115 L. Ed. 2d 836, 111 S. Ct. 2680.) In light of *Harmelin*, it is unlikely that a natural life sentence which is predicated on two or more murders would be found cruel and unusual where a natural life sentence for possessing a large quantity of cocaine was recently affirmed. Clearly, the Supreme Court would uphold a natural life sentence based on a double

murder where it has upheld a natural life sentence for a nonviolent felony such as possession of narcotics.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and MANNING, JJ., concur.